[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
In its six count complaint, plaintiff seeks damages, punitive damages, injunctive relief and other equitable relief. At trial issues relating to bad faith and damages were bifurcated; liability issues were tried. CT Page 177
Judgment should enter for defendants on each count.
Plaintiff, The Clinipad Corporation (Clinipad), was incorporated in 1970; David Greenberg (Greenberg) is its president. It is in the business of the manufacture and development of medical devices including formulae and medical wet packs. Wet packs are hermetically sealed, flexible foil packages containing antibacterial liquids, such as alcohol, tincture of benzoin, benzolkonium chloride (bzk) and povidone iodine, and said packages may also contain applicators, such as prep pads, towelettes or swabsticks. A kit, essentially, is a plastic container in which are placed devices and accessories, for a specific medical or surgical procedure, which are prepackaged and disposable; wet packs may be included in a kit.
Defendants are Aplicare, Inc. (Aplicare), Philip Hamrock (Hamrock), Bruce Wilson (Wilson), Paul Buccetti (Buccetti) and Lloyd Brown (Brown).
On June 17, 1983, Aplicare Inc. was incorporated it is in the business of the manufacture and development of medical devices including formulae and medical wet packs.
Hamrock was employed by plaintiff from August of 1977 to March 27, 1983 when he was discharged. At the time of his discharge, he was plaintiff's National Sales Manager. Now, he is a shareholder and president of Aplicare.
Wilson was employed by plaintiff from July 1974 to May 27, 1983, when he resigned. At the time of his resignation he was plaintiff's Director of Manufacturing. Now, he is a shareholder and vice-president of Aplicare.
Buccetti was employed by plaintiff from May 27, 1980 to November 18, 1983, when he resigned. At the time of his resignation, Buccetti was plaintiff's Laboratory Manager. On December 12, 1983, he was hired by Aplicare; he is Aplicare's Quality Control Manager.
Brown was employed by plaintiff from December 6, 1976 to March 26, 1982, when he resigned. At the time of his resignation, Brown was plaintiff's Quality Control Manager. Since April of 1982, he has been employed as the Director of Biological and Chemical Control by United States Surgical Corporation; also he has been a consultant to Aplicare.
After the plaintiff produced its evidence and rested its cause, defendants, pursuant to 302 of the Practice Book, moved CT Page 178 for judgment of dismissal. On August 30, 1990, this court granted said motion in part. Paragraphs 1 through 26 of the First Count are incorporated by reference into each of the other counts, i.e. Second through Sixth Counts; this court's ruling on said 302 motion as it relates to paragraphs of the First Count applies to said paragraphs which are incorporated by reference to each of the other counts.
In each of the counts, plaintiff alleges that defendants have violated the Connecticut Uniform Trade Secrets Act, 35-50 et seq. of the General Statutes, and, in counts Third through Sixth inclusive, that defendants have violated "Connecticut common law governing misappropriations of trade secrets prior to the effective date, [i.e. October 1, 1983 of CUTSA]."
Under common law in Connecticut, trade secrets are protected from misappropriation, improper use and disclosure.
 "A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound . . . or a list of customers." Restatement, 4 Torts 757, comment b; Allen Mfg. Co. v. Loika. [145 Conn. 509, 516] . . . Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. A trade secret is known only in the particular business in which it is used. It is not essential that knowledge of it be restricted solely to the proprietor of the business. He may, without losing his protection, communicate the secret to employees or to others who are pledged to secrecy. Nevertheless, a substantial element of secrecy must exist, to the extent that there would be difficulty in acquiring the information except by the use of improper means. Some of the factors to be considered in determining whether given information is a trade secret are (1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value for the information to the employer and to his competitors; (5) the CT Page 179 amount of effort or money expended by the employer in developing the information; (6) the case or difficulty with which the information could be properly acquired or duplicated by others. Restatement, 4 Torts 757, comment b.
 Trade secrets are the property of the employer and cannot be used by the employee for his own benefit. The lack of any express agreement on the part of the employee not to disclose a trade secret is not significant. The law will import into every contract of employment a prohibition against the use of a trade secret by the employee for his own benefit, to the detriment of his employer, if the secret was acquired by the employee in the course of his employment. Allen Mfg. Co. v. Loika, supra, 514; 1 Nims, Unfair Competition and Trade-Marks (4th Ed.) 150." Town Country House Hanes Service, Inc. v. Evans, 150 Conn. 314, 318, 319; Schavoir v. American Re-Bonded Leather, Co., 104 Conn. 472, 475-478; Weiss Associates, Inc. v. Wiederlight, 208 Conn. 525, 538; Trade Secrets, Ellis 1-4.
CUTSA codifies the "basic principles of common law trade secret protection. . .". Uniform Laws Annotated, Uniform Trade Secrets Act, with 1985 Amendments, p. 434. In order to establish liability under CUTSA, the plaintiff must prove the existence of a trade secret, as defined by 35-51 (d) and a "misappropriation" as defined by 35-51 (b) of the Trade secret by the defendant.
Under the Second Count, plaintiff alleges that defendants "each violated and collectively conspired to violate the Connecticut Unfair Trade Practices Act", 42-110a et seq. of the General Statutes.
 "In order to prevail in a cause of action under CUTPA, the facts proved by the evidence must establish either unfair methods of competition [or] `unfair or deceptive acts or practices,' which `have a potential effect on the general consuming public.' Ivey, Barnum O'Mara v. Indian Harbor Properties, Inc., 190 Conn. 528, 533, 540, 461 A.2d 1369 . . .; see also Conaway v. Prestia, 191 Conn. 484, 491-93, 464 A.2d 847. . . .
 The legislature has directed that `courts of this state shall be guided by interpretations CT Page 180 given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. § 45(a)(1)).' General Statutes 42-110b(b). We followed this mandate recently, and adopted the criteria set out in the `cigarette rule' by the federal trade commission for determining when a practice is unfair: (1) `[W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise, — whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [(competitors or other businessmen)].' Conaway v. Prestia, supra, 492-93, quoting FTC v. Sperry Hutchinson Co., 405 U.S. 233, 244-45 n. 5, 92 S.Ct. 898, 31 L.Ed.2d 170. . .". McLaughlin Ford, Inc. v. Ford Motor Co., 192 Conn. 558, 567, 568.
Upon the evidence presented, defendants did not use, disclose or misappropriate any trade secret of plaintiff and these four defendants did not violate Connecticut common law governing misappropriation of trade secrets, CUTSA or CUTPA.
Under paragraphs 19K of the First Count, and incorporated in all counts, plaintiff claims that defendants misappropriated its PVP Povidone Iodine formulae. This claim is rejected.
It is no secret that the essential ingredients for a povidone iodine solution are (1) povidone iodine power, (2) water, (3) a buffering system to stabilize the ph of the product and (4) surfactants to control surface tension.
Aplicare's Formula D001-1 was developed from the BASF formula; it was not developed from plaintiff's Formula 097. These formulae are different. Each has a different buffering system and different surfactant. Aplicare purchases its powder from BASF with identified properties; plaintiff makes the powder it uses. Water, as a solvent, is the only common ingredient.
Under paragraph 190 of the First Count, and incorporated in all counts, plaintiff claims that defendants misappropriated its formulae 010 [70% Isopropyl Alcohol with ethylene oxide (ETO)], 031 (Compound Tincture of Benzoin (USP) with ETO-55 gal. Batch) CT Page 181 and 031 (Compound Tincture of benzoin with ETO — 10 gal. batch); misappropriation is claimed to exist by reason of Aplicare formulae D005 (70% Isopropyl Alcohol with ETO — 50 gal. batch) D006 (Tincture of Benzoin, USP, with ETO-55 gal. batch) and D0016 (70% Isopropyl Alcohol with ETO — 50 gal. batch). This claim is rejected.
In the wet pack business, mixing alcohol with ETO as the sterilizing agent was no secret; it was well known, at least, in the 1960's. Wilson was told by the United States Food Drug Administration (FDA) that ETO could be used as a sterilant with alcohol. Concord Corporation Inc. (Concord), informed Aplicare that ETO should be used as a sterilant with alcohol wet packs which it was purchasing from Aplicare.
These formulae of plaintiff and Aplicare using ETO with alcohol are different because Aplicare uses less ETO than plaintiff by a factor of 1/3 to 1/4; therefore, with regard to safety, the formula using less ETO has an advantage.
Use of ETO with tincture of benzoin is the same concept as the use of ETO with alcohol; tincture of benzoin is based on ethyl alcohol. As with its isopropyl alcohol with ETO formulae, Aplicare uses, in its tincture of benzoin with ETO formula, 1/3 to 1/4 less ETO than plaintiff; therefore, Aplicare's formula has a safety advantage.
Plaintiff's claim under paragraph 19E, and incorporated in all counts, (Bill of Materials) of the First Count is based on the claims under paragraphs 19k and 19o. Therefore, the claims under paragraph 19E are rejected.
Under paragraph 19 L of the First Count, and incorporated in all counts, plaintiff claims that defendants misappropriated plaintiff's sterile wet pack procedures. This claim is rejected.
Three patents were issued to Francis Moore and Leon Perkinson for methods of sterilizing packaging; these patents were issued in 1971, 1973 and 1974, and each was assigned to Moore — Perk Corporation. In pertinent part said patents disclose a method of sterile packaging of surgical sponges and other articles in sealed flexible wrappers. The method involves (1) partially filling a container with an antibacterial agent, i.e. iodine, hexacloraphene, benzalkonium chloride, "Merthiolate", (2) then placing in the container items to be sterilized, (3) then sealing the container so that an air space is formed above the liquid; (4) thereafter the container and its contents are heated well below the boiling point until all organisms are killed. Specific temperatures are indicated in the patents and a range of time. CT Page 182
During the period of 1976 through 1983, Moore-Perk sold sterile labeled wet packs which had been sterilized in accordance with these patents and which had printed on the package one or more of the patent numbers.
In the fall of 1981, Brown suggested that plaintiff heat those of its wet packs containing iodine in order to sterilize the contents in the same manner as it sterilized its alcohol wet packs with ETO. Unaware of said patents, and without a search of literature which would have disclosed said patents, plaintiff proceeded to run tests to determine whether such a concept of iodine/heat sterilization would work. This project was not done as a matter of priority. From September 1981 through January or February of 1982, plaintiff proceeded with its experiments and tests on this project.
In January, or February, of 1982, plaintiff learned of the patents. In the opinion of Brown the concept of iodine/heat sterilization on which plaintiff had been working was the same as the concept in the patent of 1974; he also determined that Moore-Perk had already done the work that plaintiff was doing.
Upon discovery of the patent, plaintiff stopped work on the project, except to finish tests in progress. In June of 1982, Buccetti compiled the test results: at that time, plaintiff resumed work on the project upon the order of Greenberg.
In November of 1982, plaintiff started to assess its risk in its using the iodine/heat sterilization concept in manufacturing sterile label wet packs, in view of said patents. Plaintiff obtained legal advice in regard to said risk assessment. In March of 1983, Greenberg decided to manufacture sterile — labeled iodine wet packs using said concept. By June of 1983, plaintiff had established times and temperatures for most of its heat-sterilization products, i.e. iodine, alcohol and tincture of benzoin wet packs. In August of 1983, plaintiff first manufactured sterile labeled iodine wet packs.
Thereafter plaintiff continued to work on the parameters of its cycles. After Buccetti left plaintiff, plaintiff changed the time of the cycles for one product to 12 hours and for all other products to a minimum of 6 hours. None of defendants knew the parameters of time and temperature as revised on December of 1983 and thereafter.
When Aplicare was organized, Hamrock and Wilson did not plan to make sterile labeled iodine wet packs. However, in December of 1983, Concord requested Aplicare to manufacture sterile labeled CT Page 183 iodine wet packs because plaintiff refused to sell such products to Concord. Robert Wheeler, Jr. (Wheeler) of Concord, gave Aplicare copies of the patents. After discussion with Buccetti and Brown, Wilson decided to use the concept of sterilization as disclosed in the patent.
In January of 1984, Aplicare started work on development of iodine heat sterilization parameters, i.e., time, temperature, for iodine wet packs.
Plaintiff and Aplicare used an idea, or concept, to sterilize which is not a secret; it is published in the patents. Plastic Metal Fabricators, Inc. v. Roy, 163 Conn. 257,266. Essentially the idea used by plaintiff and Aplicare consists of partially filling a flexible package with an antibacterial chemical, with or without an applicator, leaving an airspace in the package, sealing the package, placing the packages in a heat room, elevating the temperature below the boiling point, and maintaining that temperature for a period of time. As between plaintiff and Aplicare, there is nothing unfair or improper in Aplicare's use of this idea which is disclosed in the patents.
Any claim that Aplicare misappropriated from plaintiff the concept of sterilization of alcohol or tincture of benzoin by the use of ETO and heat is rejected. This idea is essentially the same as the idea of sterilization by the use of heat and iodine and it has been used for many years; it is no secret.
Any claim that Aplicare misappropriated plaintiff's sterilization cycles, i.e. parameters of time and temperature, is rejected. Each manufacturer of wet packs must establish cycles for its products based on factors which include the package, density of the package, the sterilizer, load configuration, bioburden, and contents of the package. Aplicare developed sterilization cycles for each of its products through standard testing procedures and studies. As a result of its work, Aplicare developed cycles, which changed from time to time, and which are different from plaintiff's cycles.
Under paragraph 19 G of the First Count, and incorporated in all counts, plaintiff claims that defendants misappropriated its plans for "New Product/Project Development"; this claim relates to plaintiffs development of its sterile wet pack procedures, iodine formalae and list of suppliers. This claim is rejected as to the first and second of these items, each has been considered in this memorandum; as to the third item, it was dismissed by this court's ruling on the 302 motion. CT Page 184
Under paragraphs 19 F and 19 I of the First Count, and incorporated in all counts, plaintiff claims that defendants misappropriated its Marketing Plan and its Strategic Plan. These claims are rejected. Greenberg selected persons to be members of plaintiff's Planning Committee; the composition of the committee changed from time to time. Buccetti and Brown were not on the Committee; Wilson and Hamrock were on it. This committee provided to Greenberg matter for his consideration and about which he would make a decision.
In pertinent part, Greenberg decided that plaintiff's marketing and strategic plan would include making kit sterility a major marketing issue, and manufacturing sterile labeled wet packs which it would place in its kits, and, in most cases, not sell to other kit manufacturers.
Plaintiff's plan to manufacture sterile label wet packs and not to sell its sterile labeled wet packs to most kit manufacturers is not a trade secret. By the end of 1983, plaintiff's sales staff was telling this plan to customers.
Sales by Aplicare of its wet packs, sterile labeled or not, to kit manufacturers is not a misappropriation of plaintiff's marketing and strategic plan. Such a purpose is neither unfair or improper; it is not a use of any plan of plaintiff.
Under paragraph 19 C of the First Count, and incorporated in all counts, plaintiff claims that defendants misappropriated its Customer List. This claim is rejected.
 ". . . Depending on the nature of the business, a customer list may be a trade secret, and an employee may be restrained from using the list if he acquired it in confidence from his employer. There is no trade secret, however, if the customers' names can readily be ascertained through ordinary business channels or reference resources. Id., 319-20. The factors used to determine whether given information is a trade secret include the extent to which the information is known outside the business and by employees and others involved in the business, the measures taken by the employer to guard the secrecy of the information, the information's value to the employer and to competitors, the resources the employer expends in developing the information, and the ease or difficulty with which the information could be properly acquired or duplicated by others. Id., 319; 4 CT Page 185 Restatement, Torts 757, comment b." Robert S. Weiss Associates, Inc. v. Wiederlight, 208 Conn. 525, 538; Holiday Food Co. v. Munroe, 37 Conn. Sup. 546; American Chain Cable Co., Inc. v. Avery, 143 USPQ 126; 35-50 et seq. of the General Statutes.
Names of plaintiff's customers were maintained by its accounting department in a computer. One hard copy of this information, which was updated monthly, was kept by Hamrock, at his office. At no time did Hamrock, Wilson, Buccetti or Brown take with them any copy, or record, of the names of plaintiff's customers; nor did any one of them use such hard copy or record in the Business Plan of Aplicare or thereafter.
Any claim that the identity of kit manufacturers who purchase wet packs is a secret is rejected. Such information can readily be ascertained through ordinary business channels. Names of major kit manufacturers were well known and identifiable by people in the wet pack business. Ready sources of this information include distributors' catagories, trade shows, product brochures, government records, and professional journals. Consumers, i.e. blood banks, hospital staff, health care providers, openly discussed with vendors of wet packs the names of kit manufacturer from whom they purchase and the contents of the kits. Wet pack manufacturers customarily purchase kits and examine the contents.
Defendants did not use plaintiff's "customer list". From their years of experience in the medical devise business, Hamrock and Wilson, at trial, demonstrated their recollections of kit manufacturers. Retained memory of these experiences and information accounts for Aplicare's sales to kit manufacturers.
In view of plaintiff's plan not to sell sterile labeled wet packs to kit manufacturers, plaintiff's list of such kit manufacturers has no value.
Under the Fourth Count, plaintiff claims that each of the individual defendants, Hamrock, Wilson, Buccetti and Brown violated their contracts and their "common law duty of loyalty and fidelity owed to the plaintiff, "by improper use, disclosure or misappropriation of plaintiffs trade secrets. These claims are rejected.
Each individual defendant did sign an Employee Invention Agreement.
Upon the evidence presented and this court's findings on each of said trade secrets, the individual defendants did not CT Page 186 use, disclose or misappropriate any trade secret of plaintiff and therefore, said defendants did not violate their contracts nor their common law duty of loyalty and fidelity to the plaintiff.
Under the Fifth Count, plaintiff incorporates all of the paragraphs of the First, Second, Third and Fourth Counts and alleges, in addition, that Wilson "actively assisted in and cooperated with Defendant Aplicare and its principals, in the establishment of its business, while still an employee of the Plaintiff" and thereby Wilson breached "his contractual obligations . . . [and] his common law duty of loyalty and fidelity owed to the Plaintiff". This claim is rejected.
 "The law is well settled that, in the absence of a restrictive agreement, a former employee can properly compete with his former employer. Town and Country House Homes Service, Inc. v. Evans, 150 Conn. 314, 317. Even before the termination of his employment, an employee is entitled to make arrangements to compete, except he cannot use confidential information peculiar to his employer's business and acquired therein. Restatement, Agency 2d 393, comment e. An employee has a right to grow with his experience, and he can carry away for general use his skill and everything that he has learned at his place of employment, except trade secrets. Restatement, Agency 2d 396, comment b h." American Chain Cable Co., Inv. v. Avery, 143 U.S. PQ 126, 129; Maryland Metals, Inc. v. Metzner, 382 A.2d 564, 567-570, Meehan v. Shaughnessy, 535 N.E.2d 1255, 1264-1265.
Wilson did not breach any contract with plaintiff nor breach his duty of loyalty and fidelity to plaintiff by participating in the formation of Aplicare.
On July 11, 1974 and on June 7, 1979, Wilson signed an Employee Invention Agreement with plaintiff. At no time has Wilson violated said agreements; he has not used or disclosed any trade secret or confidential information of plaintiff. There is no non-competition agreement between plaintiff and Wilson.
Prior to leaving his employment with plaintiff on May 27, 1983, Wilson did have discussions relating to a starting a business. Prior to leaving plaintiff, Hamrock had conversations with Wilson relating to going into a business; the last of these CT Page 187 conversations was in February or March of 1983.
After he was discharged by Greenberg, Hamrock approached his father Henry Hamrock with the idea of starting a business to manufacture a scrub device. H. Hamrock, instead, suggested that his son start a business to manufacture wet packs, because there was a market and each of them, father and son, was experienced in that business. In March or April of 1983, after Hamrock was discharged, Wilson discussed with H. Hamrock and Hamrock going into the wet pack business with them; later in April of 1983, Wilson met with H. Hamrock, Hamrock and John Ilg, of Concord, to discuss going into the wet pack business.
In order to determine the feasibility to going into the manufacture of wet packs, Wilson made inquiry as to the availability of machinery and its cost. Wilson, had two or three telephone discussions between May 13 and May 23 of 1983, with Stephen Dobossy of Pak-Rite Machinery, Inc. regarding the availability, and price of used Bartelt machines. Wilson, Hamrock and Dobossy met in the middle of June to further discuss the machines to be purchased and the modification of those machines.
Wilson did not violate his duty to plaintiff by these discussions, prior to May 27, 1983, with H. Hamrock, Hamrock, Ilg and Dobossy. These discussions were fair and appropriate means of enabling Wilson to decide whether to commit to go into business with H. Hamrock and Hamrock.
On May 26, 1983, H. Hamrock told Wilson that H. Hamrock would make the financial commitment to the new business. The next day, Wilson resigned from plaintiff. Immediately thereafter, Wilson assisted Hamrock in preparing a draft of the Business Plan for the formation of Aplicare.
Wilson did not violate any duty to plaintiff by discussing with Dobossy, prior to May 27, the availability of Bartelt machines. Nor did Wilson violate any duty to plaintiff by failing to inform plaintiff that Bartelt machines were available in May of 1983. In December of 1982, at the direction of Greenberg, Wilson went to New York to look at two Bartelt machines; only one was purchased because there was no need for another. After that date, no one instructed Wilson to be on the look out for Bartelt machines. Bartelt machines were readily available in 1983, before and after Wilson left plaintiff. Plaintiff had no interest in 1983 in purchasing such machinery.
Under the Sixth Count, plaintiff claims that "all the claimed activity of all Defendants was intentional, willful and malicious subjective all Defendants to liability for punitive damages. This claim is rejected based on the findings this court has now made. CT Page 188
Accordingly judgment is hereby entered for each of the defendants on each of the First through Sixth Counts, inclusive, of the complaint.
Defendants, in their five count counterclaim seek actual, punitive and treble damages and injunctive relief.
This court defers decisions on Count I, II and III of the counterclaim which raise issues of bad faith; these issues have been bifurcated.
As to Counts IV and V of the Counterclaim defendants have failed to prove the allegations by a fair preponderance of the evidence.
Accordingly, judgment is hereby entered for plaintiff, Clinipad, on Counts IV and V of the counterclaim.
RONALD J. FRACASSE, JUDGE