ALLEN MANUFACTURING COMPANY *v.* EDWARD S. LOIKA
ET AL.

DALY, C. J., KING, MURPHY, MELLITZ and SHEA, Js.

Argued June 5—decided July 30, 1958

*William P. Aspell,* with whom were *Stephen M. Riley* and, on the brief, *James T. Healey,* for the appellants (defendants).

*Bruce W. Manternach,* with whom was *Lee C. Fielden,* for the appellee (plaintiff).

MELLITZ, J. This is an appeal taken by the defendants from a decree enjoining them from disclosing a trade secret, knowledge of which they acquired while in the employ of the plaintiff. The secret involved the use of a process, known as warm heading, in the manufacture of screws.

The plaintiff has been manufacturing screws and similar products for many years. The defendant

Edward Loika was hired by it in 1936 as a drill press operator and worked in various capacities in the plant until 1954, when he became chief of the production engineering department. The defendant James Fiorino entered the plaintiff's employ in 1953 as an electronics engineer. In 1949 or 1950 Loika had suggested to his superiors the installation of the warm heading process for shaping wire into blanks for screws. It is not a new process, having been patented by others in 1920. Its advantages are faster production, longer tool and die life, lower cost and reduction of plant equipment and space. Except for the purchase of a small induction heating unit, the plaintiff did nothing concerning the introduction of warm heading until late in 1954, when Loika and others participated in further discussions about it. Early in 1955, preliminary to installing warm heading, the plaintiff ordered a single die, two blow, heading machine for the process. Loika was in charge of the tooling, setting up and operation of this new header, and Fiorino worked on the induction heating phase under Loika's direction. After the header was delivered in May, 1955, a Westinghouse induction heating unit was tied in with it through the cooperation of the plaintiff's engineers and the Westinghouse representatives. Production of screws on the new machine began in November, 1955.

The heating unit proved unsatisfactory, and in early 1956 the plaintiff consulted with the New Rochelle Tool Corporation and ordered from it a generator type of induction heating unit, which the New Rochelle representatives installed on the plaintiff's heading machine. The New Rochelle representatives worked in close proximity to the heading machine and were considered by the plaintiff to be free to reveal the idea of this tie-up to others. The New Ro-

chelle company advertises its equipment for use in warm heading and that it will give advice on installing a warm heading process. The plaintiff encountered difficulties with its warm heading process, and the defendants assisted in overcoming them. The plaintiff expended a sum estimated to be $180,000 in developing the process. The process was installed in the plaintiff's plant in an ordinary production department, visible from the street, without being specially segregated or guarded in any way. The diagrams and tool and die drawings in connection with the process were not marked secret or confidential. Plant tours for customers, suppliers and salesmen often included the warm heading department. Observation of the process in operation would not, however, enable anyone to learn sufficient details to duplicate it, and, furthermore, no competitor of the plaintiff was permitted to view the process in operation.

In late August, 1957, while on their vacation, the defendants called at the Chicago Screw Company, a competitor of the plaintiff, inquiring if it would be interested in hiring them as engineering consultants on warm heading production of screws. Loika gave the assistant chief engineer of the Chicago Screw Company a sample of the plaintiff's production from warm heading, explained the advantages of two-blow screw machines, and indicated that he could solve the lubrication problem involved in the warm heading process. Although asked, the defendants did not tell what lubricant, wire coating and temperature were used by the plaintiff in the process. On September 4, 1957, the defendants resigned their employment with the plaintiff. At no time prior to that date did the plaintiff request any of its employees to keep secret or confidential the details of its warm heading proc-

ess. Of the plaintiff's many competitors, only one has developed a warm heading process, and that varies from the plaintiff's process. The plaintiff's warm heading process gives it a competitive advantage. It would take a competitor about two years to develop a process like that of the plaintiff, and if the defendants revealed their knowledge, the plaintiff would lose its competitive advantage in a matter of weeks. The court concluded that the warm heading process as used by the plaintiff was a trade secret which the defendants learned while employed by the plaintiff in a position of confidence and that the plaintiff was entitled to protection by injunction against its disclosure by the defendants. An injunction for one year was granted.

The defendants attack the finding in numerous particulars, seeking the elimination of twenty paragraphs and the addition of a like number. No corrections which will advantage the defendants are warranted. The facts essential to a disposition of the ultimate issue are not in dispute. The defendants, as employees of the plaintiff, participated over a period of years in the development of a warm heading process for the manufacture of screws in the plaintiff's plant. The process is not generally known in the trade and gives the plaintiff a substantial advantage over its competitors. The position of the defendants is that they may take the knowledge they acquired while participating in the perfection of the process as employees of the plaintiff and freely use it for their own advantage by imparting that knowledge to the plaintiff's competitors, to the harm of the plaintiff. They assert that the plaintiff has no property interest in the process which a court will protect since warm heading is not a secret process and the materials and methods by which the plaintiff de-

veloped it are well known and generally available, and further that the plaintiff did not take steps indicating that it regarded warm heading at its plant as a trade secret.

The law is well settled that knowledge acquired by an employee during his employment cannot be used for his own advantage to the injury of the employer during the employment; and after the employment has ceased the employee remains subject to a duty not to use trade secrets, or other confidential information, which he has acquired in the course of his employment, for his own benefit or that of a competitor to the detriment of his former employer. 4 Williston, Contracts (Rev. Ed.) § 1025; *Byrne* v. *Barrett,* 268 N.Y. 199, 206, 197 N.E. 217. It matters not that there is no specific agreement on the part of the employee not to disclose the knowledge he has so acquired. "[T]he law will import into the contract [of employment] a prohibition against a betrayal of [the employer's] trust and confidence and against imparting confidential information to others. In fact, such a stipulation probably is a part of every employment, whether actually expressed or not. Employees are bound by such an implied obligation even though they be not under contract at all." 1 Nims, Unfair Competition & Trade-Marks (4th Ed.) § 150; *Junker* v. *Plummer,* 320 Mass. 76, 80, 67 N.E.2d 667. Of the claim made in *Schavoir* v. *American Re-Bonded Leather Co.,* 104 Conn. 472, 475, 133 A. 582, that the employer did not have a property right entitled to protection in equity, it was said: "The principle upon which courts proceed in the protection of trade secrets is stated in *Du Pont De Nemours Powder Co.* v. *Masland,* 244 U.S. 100, 102, 37 Sup. Ct. 575 [61 L.Ed. 1016], where the court, by Justice Holmes, said: 'The word property as applied

to trade-marks and trade secrets is an unanalyzed expression of certain secondary consequences of the primary fact that the law makes some rudimentary requirements of good faith. Whether the plaintiffs have any valuable secret or not the defendant knows the facts, whatever they are, through a special confidence that he accepted. The property may be denied but the confidence cannot be. Therefore the starting point for the present matter is not property or due process of law, but that the defendant stood in confidential relations with the plaintiffs, or one of them. These have given place to hostility, and the first thing to be made sure of is that the defendant shall not fraudulently abuse the trust reposed in him. It is the usual incident of confidential relations.' "

The defendants base their position first on the contention that since the materials by which the warm heading process was developed in the plaintiff's plant are all common, commercially available components, and the warm heading process is itself a recognized form of heading, no trade secret could have resulted. This claim is effectively answered in the conclusion reached by the trial court: "Although the header, heating unit, lubricant or coolant, and wire used might be available to competitors, plaintiff's ability to combine these elements into a successful warm heading process, like the creation of a recipe from common cooking ingredients, is a trade secret entitled to protection." As observed in *Sun Dial Corporation* v. *Rideout,* 16 N.J. 252, 257, 108 A.2d 442: "[T]he fact that every ingredient is known to the industry is not controlling for the secret may consist of the method of combining them which produces a product superior to that of competitors." Definitions of "trade secret" abound in

the reported cases. 42 Words & Phrases (Perm. Ed.) 295. In Restatement, 4 Torts § 757, comment b, the following definition is given: "A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. . . . A trade secret is a process or device for continuous use in the operation of the business." There can be no question that the plaintiff's warm heading process fits clearly into this definition. The defendants argue that an essential element of a trade secret is secrecy and that this factor was lacking in the manner in which use of the process was carried on in the plaintiff's plant. The trial court concluded on the evidence before it that the plaintiff reasonably protected the secrecy of its process so that no competitor or member of the public had discovered it. Reasonable precautionary measures for maintaining the secrecy of the process were all that were required. The question was one of fact for the trial court, and the finding fully supports its conclusion.

The defendants point to *Samuel Stores, Inc.* v. *Abrams*, 94 Conn. 248, 252, 108 A. 541, and urge that the result of the judgment restraining them from pursuing their activities is an unreasonable restriction upon the rights of employees and the freedom to exercise their talents to earn a livelihood. No restriction is placed upon the defendants by the injunction except to the extent of requiring them to preserve inviolate what came to them in confidence. There is no question that their knowledge of the

warm heading process, as it was finally perfected and made suitable for efficient and profitable operation, was acquired in the course of their employment with the plaintiff. The basis for the protection of trade secrets is that the recipient obtains through a confidential relationship something he did not know previously. Ellis, Trade Secrets, p. 36. The comment in *Sun Dial Corporation* v. *Rideout*, 16 N.J. 252, 260, 108 A.2d 442, is apt: "There is undoubtedly . . . an important policy which 'encourages employes to seek better jobs from other employers or to go into business for themselves.' . . . But there is also a policy which is designed to protect employers against improper disclosures of information which their employees have received in confidence and this policy may perhaps be receiving increased recognition in the light of the marked changes in the attitude of the law towards the need for commercial morality. . . . Our judicial decisions have faithfully sought to vindicate both policies by preserving to employees their unfettered right to leave their employment and use elsewhere their acquired skill and knowledge of the trade generally as distinguished, however, from any trade secrets imparted to them in confidence and which they must continue to honor as such." The opportunities for the defendants to pursue their economic interests continue open to them despite the injunction, provided they refrain from appropriating to themselves the plaintiff's property right in the warm heading process developed and employed by it in the conduct of its business.

There is no error.

In this opinion the other judges concurred.