[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
CT Page 196
The principal issues in this civil action are (1) whether the defendant misappropriated the plaintiff's trade secret documents, and (2) if so, to what extent his use of those documents resulted in his unjust enrichment.
The plaintiff, Dunsmore Associates, Ltd., is a Connecticut corporation engaged in the business of recruiting marketing researchers (candidates) and placing them at many of the largest consumer goods corporations (clients) in the United States for a fee. The fee paid by the client company was generally 30% of the candidate's annual starting salary. The plaintiff was founded in August, 1981, by Joseph Dunsmore (Dunsmore), its president. The following month, Dunsmore hired the defendant, Dominick A. D'Alessio, to work with him in recruiting marketing researchers. The defendant had no experience in the business. In March, 1993, Dunsmore also hired John Hoover. For most of its history, the company consisted of these three gentlemen and a small office support staff.
When the plaintiff first began to do business, it had few client contacts and virtually no pool of candidates. Over time, it developed extensive contacts in the marketing research departments of many major companies and acquired a veritable library of information on thousands of marketing researchers.
Virtually none of the plaintiff's dealings with both clients and candidates were done face-to-face. Rather, the telephone was the plaintiff's dominant means of communication. When the plaintiff learned of an opening in a marketing research department of a client, Dunsmore, the defendant, or Hoover would then try to fill the vacancy with a candidate who had compatible qualifications and personal preferences. For personal reasons, the most qualified candidate might not be the best person, or the best "fit," for a particular job opportunity. In the course of such initiatives, the plaintiff would seek to elicit new information about client companies and other candidates. Through networking, the plaintiff's candidate pool, and other valuable industry contacts, grew. If the client company hired the candidate referred within a year, the plaintiff received a fee.
Of the three men in the business, the defendant was the plaintiff's top producer. The plaintiff paid the defendant a commission of 21% for each candidate placed, regardless of CT Page 197 whether the candidate was placed through the defendant's efforts.[1] Hoover was paid 8.5% of the fee earned on each placement. Neither the defendant nor Hoover ever signed a covenant not to compete with the plaintiff or a confidentiality agreement.
The plaintiff maintained records of the names of those who were in the marketing research departments of various client companies, and those who were responsible for the hiring in those departments. Through such contacts, it would seek to ascertain when a marketing research position was becoming available. To assist in filling such a position, the plaintiff maintained voluminous records on thousands of people involved in marketing research throughout the nation. One source of such information was the plaintiff's "Alpha" list, or candidate listing. The "Alpha" list contained the names of over 5,000 active marketing researchers, the initials of the client companies at which they had been or were employed, and their last known salary. The list, however, did not contain current accurate information on all 5,000 people. Some changed jobs periodically and/or received salary increases and others left marketing research altogether. The Alpha list was up-dated periodically, albeit in a non-systematic manner, when information was obtained by Dunsmore, the defendant, or Hoover from their many contacts in the industry and/or from industry publications. Some people, with whom the plaintiff never spoke, but about whom the plaintiff had information, were also on the Alpha list unbeknownst to the candidate himself or herself.[2]
In addition to the Alpha list, the plaintiff maintained candidate files on marketing researchers with whom it had dealings. Files were maintained not only on marketing researchers whom the plaintiff placed, but many others, such as those it unsuccessfully sought to place. In addition, these files often contained personal information such as the person's educational background, college major and minor, past employment, past résumé, geographical preferences, and if applicable, spouse's geographical preferences. This information was crucial, not only in ultimately placing the candidate, but also in establishing and maintaining a rapport with him/her since there was no in-person interaction between the plaintiff's recruiters and the candidates.
Information about candidates and clients was elicited by telephone. Additionally, the plaintiff gleaned information from CT Page 198 trade publications such as Advertising Age, Inside Research, and the American Marketing Association's annual International Member Marketing Services Guide.
No later than mid-1997, the defendant secretly decided to leave the plaintiff's employ and start a competing business. In the summer of 1997, he leased 1,000 square feet of office space in Essex, Connecticut, purchased furniture, and arranged for telephone service. In late-1997, he consulted an attorney and an accountant.
By late-1997, Dunsmore suspected that something was awry. The defendant's demeanor, work habits, and productivity significantly deteriorated. Although Dunsmore and the defendant lunched together for nearly seventeen years, and had built a successful business together, Dunsmore did not inquire of the defendant as to whether he was dissatisfied with his lot, and the defendant did not disclose his dissatisfaction.
From the numerical tabulation on the plaintiff's photocopying machine, Dunsmore discovered, in early 1998, that an unusual amount of copying was taking place. On the morning of Thursday, January 22, 1998, Dunsmore confronted the defendant and formally terminated him. The defendant started to depart with a briefcase containing documents which Dunsmore believed belonged to the plaintiff. Dunsmore demanded that the defendant open the briefcase and return the documents. The defendant refused and then departed. In fact, over the past months, the defendant had taken many files, résumés, and recent versions of the Alpha list which he refused to return.
The defendant started his competing business immediately, on January 22, 1998. Two days later, Hoover left the plaintiff's employ and went to work for the defendant. In February, the defendant hired Laurie Polizzi, whom the plaintiff had fired 7 1/2 years earlier.
According to the defendant, on January 22, 1998, there were three or four client companies for which he was, or would be, seeking to place candidates. Also, according to the defendant, he secured eight clients within thirty days: Pillsbury, Kraft, Bristol Myers Squibb, Campbell's Soup, Tropicana, A.C. Nielsen, IRI, and American Express. All of these clients were also clients of the plaintiff in the past. The defendant's business is more targeted than the plaintiff's with respect to the quality of CT Page 199 candidates that he places. That is, where the plaintiff places candidates of varying caliber and experience, the defendant seeks to handle only the "best" candidates. This practice is reflected in the choice of files and résumés he took from the plaintiff.
On February 26, 1998, the plaintiff commenced this action for legal and injunctive relief. The complaint is in five counts. The first count alleges a common law action for misappropriation of trade secrets. The second count alleges violation of the Connecticut Uniform Trade Secrets Act (CUTSA), General Statutes §35-50 et seq. The third count alleges tortious interference with business relationships. The fourth count alleges violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. The fifth count claims that as a result of these alleged violations, the plaintiff has been irreparably damaged by the defendant, lacks an adequate remedy at law and is entitled to injunctive relief. The plaintiff filed an application for a temporary injunction together with its complaint. In response, the defendant filed an answer and counterclaim in two counts sounding in breach of contract and breach of the implied covenant of good faith and fair dealing. The plaintiff filed an answer to the defendant's counterclaim and asserted two special defenses: statute of limitations and statute of frauds.
In its application for temporary injunctive relief, the plaintiff sought an order enjoining the defendant "from using or disclosing any confidential information or trade secrets of the plaintiff and from soliciting, calling upon, selling or offering to sell any services on the field of marketing research personnel to any customer, client or account of the plaintiff pending a hearing. . . ." After a hearing, the court, Downey, J., granted the plaintiff's application for a temporary injunction enjoining the defendant from "(1) using or disclosing any confidential information or trade secrets of the plaintiff. (2) contacting, soliciting, seeking to place or placing in employment, any individual listed on the plaintiff's most recent alpha listing, as of January, 1998, until further order of the court." The defendant also was "ordered to deposit, in a segregated account, any and all monies derived from employment placement by defendant of any individuals listed on the plaintiff's alpha listing as of January, 1998, during the period January 1998 to [September 4, 1998] and to hold such monies in said account until further order of the court." On October 25, 1999, the court dissolved the temporary injunction. CT Page 200
Additional facts will be set forth as necessary.
 I
The court first addresses the plaintiff's claim under CUTSA, General Statutes § 35-50 et seq.
"We begin our analysis by restating some basic principles of the law governing trade secrets. Generally speaking, in the absence of a restrictive covenant, a former employee may compete with his or her former employer upon termination of employment.Town Country House Homes Service, Inc. v. Evans,150 Conn. 314, 317, 189 A.2d 390 (1963). Even after the employment has ceased, however, `the employee remains subject to a duty not to use trade secrets, or other confidential information, which he has acquired in the course of his employment, for his own benefit or that of a competitor to the detriment of his former employer.'Allen Mfg. Co. v. Loika, [145 Conn. 509, 514, 144 A.2d 306
(1958)]." Elm City Cheese Co. v. Federico, 251 Conn. 59,69, ___ A.2d ___ (1999).
"According to [General Statutes] § 35-51(d), a trade secret is `information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.'" Elm City Cheese Co. v.Federico, supra, 251 Conn. 69-70.
For the plaintiff to be entitled to damages for violation of the CUTSA, it must prove that the information it claims is protected (1) is of a type that can be considered a "trade secret" under General Statutes § 35-51(d) of the act, (2) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (3) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy, and (4) was misappropriated by the defendant. General Statutes §§ 35-51(b), (d).
Finally, in order to recover compensatory damages, the CT Page 201 plaintiff must prove that it sustained actual loss, or that the defendant was unjustly enriched, as a result of its misappropriation. General Statutes § 35-53(a). In addition, in order for the plaintiff to recover punitive damages, the court must find "wilful and malicious misappropriation." General Statutes § 35-53(b).
 A
The first "`issue to be determined . . . is whether there is a trade secret existing which is to be protected.' Plastic MetalFabricators, Inc. v. Roy, 163 Conn. 257, 267, 303 A.2d 725
(1972). Essentially, according to § 35-51(d), in addition to the two enumerated requirements, to constitute a trade secret, information must be of the kind included in the nonexhaustive list contained in the statute. The first step in our analysis, therefore, is a determination of whether the information at issue satisfies this threshold requirement." Elm City Cheese Co. v.Federico, supra, 251 Conn. 70. To make this determination, the court must first identify the documents that are claimed to be a trade secret.
The plaintiff claims that its Alpha list and candidate files (including candidate résumés) constitute trade secrets. With certain exceptions not claimed to be applicable here, General Statutes § 35-51(d) provides that "`trade secret' means information, including a . . . compilation. . . ." It is this compilation of information that is the claimed trade secret here. Cf. Allen Mfg. Co. v. Loika, 145 Conn. 509, 515-16, 144 A.2d 306
(1958). This is not to say, or to hold, that "each and every component is necessarily a trade secret in and of itself. . . ." ElmCity Cheese Co. v. Federico, supra, 251 Conn. 73. The court finds that the information at issue here is of a type considered a "trade secret" under General Statutes § 35-51(d) and is protected by CUTSA.
 B
"A primary issue to be determined in all [trade secret] actions is whether there is a trade secret existing which is to be protected." Plastic Metal Fabricators, Inc. v. Roy, supra,163 Conn. 267. In order for the plaintiff to establish that its documents are protected as a trade secret, it must satisfy a two-tier test under General Statutes § 35-51(d). The compilation of information claimed to be a trade secret must "(1) derive
CT Page 202 independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) [be] the subject of efforts that are reasonable under the circumstances to maintain its secrecy." General Statutes §§ 35-51(d)(1), (2).
 1. Generally Known Or Readily Ascertainable By Proper Means
"There is no trade secret . . . if the customers' names can readily be ascertained through ordinary business channels or reference resources." Robert S. Weiss Associates, Inc. v.Wiederlight, 208 Conn. 525, 538, 546 A.2d 216 (1988). "[W]here the identity of the customers is readily ascertainable through ordinary business channels or through classified business or trade directories, the courts refuse to accord to the list the protection of a trade secret." Town Country House HomesService, Inc. v. Evans, supra, 150 Conn. 320.
The following additional facts are found and are necessary for the disposition of this issue. The plaintiff would usually first learn of a vacancy in a marketing research department from its contacts within a client company. Filling the vacancy entails more than merely finding a marketing researcher. It requires finding the right researcher for the job. Moreover, the defendant places only the most accomplished and highly paid marketing researchers. For him, the right marketing researcher would not be a recent college graduate or even a person who has been working in the industry for any particular period of time. Here, the Alpha list provided an unusually convenient and quick reference point. From the Alpha list, the defendant could readily ascertain where a particular marketing researcher was employed and at what salary. The most accomplished marketing researchers tended to be already employed and at higher salaries.
Even this information would not be sufficient to effect a placement. To try to find a suitable candidate from only a name, place of employment, and salary, would be tantamount to trying to find the proverbial needle in only a somewhat tapered haystack. There are tens of thousands of marketing researchers in the United States,[3] and many who are very good at what they do. Moreover, client companies and marketing researchers are scattered throughout the country. This is where the plaintiff's CT Page 203 candidate files became very valuable.
The presence of a candidate's name on the Alpha list would, in many instances, alert the recruiter that a file on that candidate existed. These files often contained personal information about the candidate, as well as the candidate's résumé. From this additional information, the recruiter might be able to ascertain whether the candidate would be interested in the available position and whether the client company would be sufficiently interested in the candidate.
The defendant argues that the compilation of information claimed to be a trade secret is generally known or readily ascertainable by proper means. He claims that he had dealt with many candidates before and suggests that he had committed to memory the information contained in the plaintiff's documents. "The Restatement of Agency takes the position that an employee is ordinarily privileged to use the names of customers retained in his memory as a result of his normal employment activities in competing with his former employer, after termination of his employment. Restatement (second), Agency [§] 396. Most of the cases have supported this view." Holiday Food Co. v. Munroe,37 Conn. Sup. 546, 555, 426 A.2d 814 (App. Sess. 1981) (Shea, J.,concurring).[4] The defendant further argues that the information was available from reference resources such as the American Marketing Association's ("AMA") directory, InsideResearch, business schools, and ordinary business channels. "A matter may be generally known . . . through general publication, as in a trade journal. . . . (Internal citations omitted.) Plastic Metal Fabricators, Inc. v. Roy, supra, 163 Conn. 265-66.
With one exception, discussed infra, the court does not find that the defendant had such a long-standing relationship with people on the Alpha list that he would remember the detailed personal information about them contained in their files. Indeed, the defendant did not have a very good memory at all. He could remember few names from the pool of candidates with which he worked prior to departing the plaintiff's employ. Surprisingly, and somewhat unsettling, the defendant, a man only in his early 50's, could not even remember his college major or whether he left college in his third or fourth year of study. While the defendant testified that "there was some very big personal crisis in my life at that time" and that "[i]t was a very difficult time" for him, the court was never informed as to what the crisis or difficulty was. CT Page 204
The publication Inside Research clearly does not contain a volume of data analogous to the Alpha list. The publication is an international newspaper of marketing that contains a tiny section announcing the promotions of a few high ranking officials, sometimes from marketing positions to offices such as president and vice president of major corporations.
Colleges with marketing departments could not provide information approximating the Alpha list. At best, they could disclose information about alumni who have graduated recently. Moreover, the defendant was not interested in such individuals. He sought to target his business at placing only the "best" — necessarily experienced — candidates.
The AMA directory, however, does contain an abundance of information, including the names of thousands of people in the field of marketing research, their areas of specialty or familiarity (i.e., consumer marketing, marketing research), the position they occupy, and their employer. The names number over 20, 000. Many, however, are not in the field of marketing research or are academicians of marketing research. In many instances, the directory contains the home address and phone number of individuals. It does not reveal salary information, or prior employers, as does the Alpha list.
The names of marketing researchers and their current employer, as contained on the Alpha list, were, therefore, generally known. A trade secret plaintiff, however, need not prove that every element of information in a compilation is unavailable elsewhere.Boeing Co. v. Sierracin Corp., 108 Wash.2d 38, 738 P.2d 665, 675
(Wash. 1987). The researcher's current salary and his past employment, however, was not generally known, nor was such information readily ascertainable by proper means by, persons other than the plaintiff who could obtain economic value from the disclosure or use of such information. The information in the plaintiff's candidate files was not generally known, or readily ascertainable by proper means. Those files often contained unique, personal information about the candidate, as well as, the candidate's résumé. The court does not find credible the defendant's evidence that, in response to a telephone call from a recruiter, out of the blue, people in marketing research would readily forward their résumés or disclose other personal information. CT Page 205
 2. Derives Independent Economic Value From Its Secrecy
In addition to "not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use," General Statutes § 35-51(d)(1) requires that the claimed trade secret must derive "independent economic value, actual or potential" from this quality. General Statutes § 35-51(d)(1). This requirement "has been interpreted as a codification of the common-law requirement that a trade secret must give its owner a competitive advantage." Elm City Cheese Co. v. Federico, supra,251 Conn. 88 n. 27.
As observed supra, there are well over 20,000 marketing researchers in the United States.[5] In the absence of personal data about candidates, finding the right candidate for a job opening would be like taking a shot at a target in the dark. Armed with information such as salary, last employer, age, experience, and other personal information gleaned from the Alpha list and candidate files, a new enterprise such as the defendant's could readily ascertain which candidates reached that station in their career to be suitable for a particular job opening. From other information in the candidate files, such as that pertaining to the candidate's spouse or family, the defendant could further target his search by ascertaining which suitable candidate would be likely to welcome the job change or job relocation presented by the new employment opportunity. Although some of this information might have been obtainable by telephoning the marketing research departments in the various divisions of major corporations throughout the United States, the time and expense in doing so would be enormous. And, while some percentage of the Alpha list was not up-to-date at any given time because researchers changed jobs (or names, by marriage) faster than the plaintiff could keep track of such changes, the Alpha list was still the most efficient vehicle for locating candidates and gauging their qualifications. The plaintiff's Alpha list and candidate files derive independent economic value from their information not being generally known.
 3. Reasonable Efforts to Maintain Secrecy
CT Page 206
Additionally, General Statutes § 31-51(d)(2) provides that a trade secret must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy."
For many years, the plaintiff's offices have been located on the third floor of a building in the town of Guilford. No other business shared office space with the plaintiff. The picture that emerges from the evidence is of a relatively small office space in a modest building. The main door to the building from the street is locked. There is a separate entry into the plaintiff's offices which has a dead-bolt and conventional lock. Only Dunsmore, the defendant, and Hoover, had keys to the plaintiff's offices. There was a file room with filing cabinets containing the plaintiff's files. The door to the file room was locked; only the three recruiters had keys to the room. In addition to the files, candidate and corporate client information was stored on a computer to which Dunsmore alone had the code. It was unusual for anyone to visit the plaintiff's offices other than to deliver packages. Regular mail deliveries were not made at the office. Communication with candidates, nearly all of whom resided outside of Connecticut, was accomplished by telephone. In the history of the plaintiff's business, hardly any candidates visited the office.
The defendant argues that the plaintiff's documents were not sufficiently kept secret because the plaintiff's initial letter agreement employing him in 1981 provided that "[t]he `file of candidates' (present as well as future candidates) will be considered open. . . ." The agreement also provided, inter alia: "As agreed, the financial agreement between you and Dunsmore 
Associates, Ltd. is as follows:
"A. For any business which you generate for Dunsmore 
Associates, Ltd., your percentage will be 30% of the total billing.
"B. For any business which Joe Dunsmore generates, your percentage will be 10% of the total billing.
"C. The `file of candidates' (present as well as future candidates) will be considered open and if a placement is made, the above percentages will apply. . . ."
In the construction of contracts and correspondence alike, the court must consider the document as a whole. See Barnard v.
CT Page 207Barnard, 214 Conn. 99, 109, 570 A.2d 690 (1990) (contract); Zullov. Smith, 179 Conn. 596, 604, 427 A.2d 409 (1980) (correspondence). It is clear from the context of the agreement letter that the word "open" does not mean "non-confidential" but, rather, means available for use by the defendant.
The defendant also argues that candidate files were often kept scattered on the recruiters' desks, sometimes on the floor, and were not gathered and locked in the file room at the end of the workday. Furthermore, the defendant argues that there were no formal policies regarding access to candidate files, or a check-in/check-out log system to keep track of who had a particular file. This evidence does militate against a finding of secrecy. However, efforts that are reasonable under the circumstances to maintain the secrecy of information for a large company are quite different for a small company, such as the plaintiff company. See Jackson v. Hammer, 274 Ill. App.3d 59,653 N.E.2d 809, 815, rehearing denied, appeal denied, 164 Ill.2d 565,660 N.E.2d 1270 (1995); Elm City Cheese Co. v. Federico,
supra, 251 Conn. 80 ("What may be adequate under the peculiar facts of one case might be considered inadequate under the facts of another.").
The defendant also points out that the plaintiff acquiesced in his taking files home. Also, throughout his tenure with the plaintiff, the defendant's commission checks, each of which he retained a copy, reflected the name of the candidate and the client company at which the candidate had been placed. With this information, and the amount of the commission, the defendant could interpolate the salary that the candidate had been hired at. However, it would have been remarkable if anyone, even a prodigiously curious bank clerk, could have divined the significance of these notations. Insofar as the defendant contends that the checks divulged the trade secret to him, this argument misconstrues the nature of the trade secret and the secrecy requirement. The secret was not the physical file and papers, but the information they contained. "The defendant, as an agent of the plaintiff, was a fiduciary with respect to matters within the scope of his agency." Town Country House HomesService, Inc. v. Evans, supra, 150 Conn. 317. The plaintiff had reposed a trust or confidence in him, which in the exercise of the utmost good faith, loyalty and honesty, the defendant was required to maintain. Id. This duty exists regardless of the format in which the defendant held the confidential information. CT Page 208
Absolute secrecy is not essential. Plastic Metal Fabricators,Inc. v. Roy, supra, 163 Conn. 268. General Statutes § 31-51(d)(2) requires only that efforts to maintain secrecy be "reasonable under the circumstances. . . ." (Emphasis added.) See Elm CityCheese Co. v. Federico, supra, 251 Conn. 80; cf. Allen Mfg. Co.v. Loika, supra, 145 Conn. 516 (Under common law, "[r]easonable precautionary measures for maintaining . . . secrecy . . . were all that were required."). The court finds that the plaintiff undertook efforts that were reasonable under the circumstances to maintain the secrecy of the information in its Alpha list and candidate files.[6]
 C
In order to obtain monetary relief, the plaintiff must prove that the defendant committed a "misappropriation" of the trade secret in violation of General Statutes § 35-51(b)(2). "Misappropriation" is defined by General Statutes § 35-51(b)(2) as "disclosure or use of a trade secret of another without express or implied consent by a person who . . . (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. . . ." (Emphasis added.)[7]
Whether the defendant made use of the plaintiff's Alpha list and candidate files is not a difficult factual question because he admitted doing so.[8] The defendant surreptitiously photocopied or removed original confidential documents of the plaintiff en masse without consent. Toward the end of his employment, the defendant took documents and photocopies without knowledge by Dunsmore and, at his termination, despite Dunsmore's protest. The defendant then used the information contained in these documents in the recruitment of candidates after his employment had ceased. Clearly, he did not have consent to do so. This was misappropriation.
Just as clearly, the defendant knew, or had reason to know, that his knowledge of the Alpha list and candidate files were acquired under circumstances giving rise to a duty to maintain their secrecy. "The defendant, as an agent of the plaintiff, was a fiduciary with respect to matters within the scope of his agency. The very relationship implies that the principal has reposed some trust or confidence in the agent and that the agent or employee is obligated to exercise the utmost good faith, CT Page 209 loyalty and honesty toward his principal or employer. . . . Upon termination of the agency, however, and in the absence of a restrictive agreement, the agent can properly compete with his principal in matters for which he had been employed." (Citations omitted.) Town Country House Homes Service, Inc. v. Evans,
supra, 150 Conn. 317. See Elm City Cheese Co. v. Federico, supra,251 Conn. 92. However, "[t]he law is well settled that . . . after the employment has ceased the employee remains subject to a duty not to use trade secrets, or other confidential information, which he has acquired in the course of his employment, for his own benefit or that of a competitor to the detriment of his former employer. It matters not that there is no specific agreement on the part of the employee not to disclose the knowledge he has so acquired. [T]he law will import into the contract [of employment] a prohibition against a betrayal of [the employer's] trust and confidence and against imparting confidential information to others. In fact, such a stipulation probably is a part of every employment, whether actually expressed or not. Employees are bound by such an implied obligation even though they be not under contract at all." (Citations omitted; internal quotation marks omitted.) Allen Mfg.Co. v. Loika, supra, 145 Conn. 514, 517. See Elm City Cheese Co.v. Federico, supra, 251 Conn. 69; Blue Cross Blue Shield ofConnecticut v. DiMartino, Superior Court, judicial district of New Haven at New Haven, Docket No. 300642 (July 2, 1991,Schaller, J.). The court finds that the defendant misappropriated the plaintiff's trade secrets in violation of General Statutes §35-51(b)(2).
 D
Having determined that the defendant misappropriated the plaintiff's trade secrets in violation of General Statutes § 35-51(b)(2), the next issue is what the plaintiff's remedy will be.
General Statutes § 35-52 provides that where the defendant has misappropriated a trade secret, the plaintiff may be granted injunctive relief. The court, Downey, J., granted the plaintiff temporary injunctive relief on September 9, 1998. In the case-in-chief, evidence was heard on March 30, 1999, March 31, 1999, June 29, 1999, and June 30, 1999. Oral argument was held on September 27, 1999, at which time, the plaintiff did not strenuously argue for protracted injunctive relief. After one year, on October 25, 1999, this court terminated that injunction CT Page 210 based on equitable considerations, including the interest of the general public in an open marketplace. See New Haven Tobacco Co.v. Perrelli, 11 Conn. App. 636, 642, 528 A.2d 865 (1987), on appeal, after remand, 18 Conn. App. 531, 559 A.2d 715, cert. denied, 212 Conn. 809, 564 A.2d 1071 (1989) ("[t]he interest the employer seeks to protect must be weighed against the interest of the general public in an open marketplace."). See also Robert S.Weiss Associates, Inc. v. Wiederlight, supra. 208 Conn. 529.
General Statutes § 35-53(a) provides in part: "In addition to or in lieu of injunctive relief, a complainant may recover damages for the actual loss caused by misappropriation." Here, no actual loss has been proven. Actual loss in this context means the amount of money that the plaintiff lost from the defendant's misappropriation; it is measured by how much better off the plaintiff would have been but for the defendant's misappropriation. Cf. U.S. v. Haddock, 956 F.2d 1534 (10th Cir. 1992), on rehearing in part, 961 F.2d 933 (10th Cir. 1992), cert. denied, 506 U.S. 828, 113 S.Ct. 88, 121 L.Ed.2d 50,956 F.2d 1534 (10th Cir. 1992), and appeal after remand, 12 F.3d 950, 960
(10th Cir. 1993), 50 F.3d 835 (10th Cir. 1995). The plaintiff has not proven that the taking of the physical documents, the Alpha list and the candidate files, caused it any loss. In fact, nor has the plaintiff proven that the defendant's use of the files caused it actual loss in the sense that, but for the defendant's use of these documents, the plaintiff would have effectuated candidate placements and earned a fee or commission therefor.
However, General Statutes § 35-53(a) provides further: "A complainant also may recover for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss." "Unjust enrichment is a very broad and flexible equitable doctrine . . . which has as its basis that it is contrary to equity and good conscience for the defendant to retain a benefit which has come to him at the expense of the plaintiff. . . . Its three basic requirements are (1) that the [defendant was] benefitted [benefited], (2) that the [defendant] unjustly did not pay the [plaintiff] for the benefits, and (3) that the failure of payment was to the [plaintiff's] detriment. . . ." (Citations omitted.) Zanoni v. Hudon, 48 Conn. App. 32, 39,708 A.2d 222, cert. denied, 244 Conn. 928, 711 A.2d 730 (1998). Here, each of these elements hinge on the single most disputed question in this case: whether the defendant's misappropriation of the plaintiff's trade secrets caused the defendant to be unjustly enriched. General Statutes § 35-53 contains an explicit causation CT Page 211 requirement. "To be actionable, the violation of [General Statutes § 35-53(a)] must be shown to have been the proximate cause of the injury." Krupa v. Farmington River Power Co.,147 Conn. 153, 159, 157 A.2d 914 (1959), appeal dismissed and cert. denied, 364 U.S. 506, 81 S.Ct. 281, 5 L.Ed.2d 258 (1960). Otherwise stated, the issue is whether the defendant used the plaintiff's documents to make candidate placements that resulted in the defendant's receipt of fees or commissions.
"To constitute such causal relation between defendant's tort and plaintiff's damage as will suffice to maintain an action of tort, the defendant's tort must have been a substantial factor in producing the damage complained of." (Internal quotation marks omitted.) Mahoney v. Beatman, 110 Conn. 184, 195, 147 A. 762
(1929). Whether such a causal, relation exists is ordinarily a question of fact for the trier. Coburn v. Lenox Homes, Inc.,186 Conn. 370, 384, 441 A.2d 620 (1982).
On March 23, 1998, in open court, the defendant returned a multitude of documents that he had taken from the plaintiff without its consent. In this volume of documents were 39 original candidate file folders, 125 photocopies of file jackets, 125 résumés, research materials, corporate client materials, and three Alpha lists.
Between January, 1998, and January, 1999, the defendant placed twenty-one candidates at various client companies. The plaintiff claims that thirteen of those placements were the product of the defendant's misappropriation of plaintiff's trade secret documents. With respect to the first fifteen placements, the defendant conceded at trial that nine had been candidates of the plaintiff. Those nine were James Norgren, Jennifer Backs, Rajan Krish, Nadu Pasupuletti, Kelly Kohlstruk, Judith Whisler, Pat Custis, Monica Wingate, and Eric Taylor.[9] For reasons discussed, infra, the parties are at issue as to whether two others placed by the defendant during this period, Judith Rubin and Brad Fiery, had been candidates of the plaintiff as well.
The plaintiff believed that the defendant did not return all of the candidates' material in March, 1998. In the spring of 1998, it provided to the defendant a list of files and résumés that it believed were still missing from its office. Fiery, Kohlstruck, Krish, Norgren, Whisler, and Wingate were all on this list. The list was compiled and delivered to the defendant before the plaintiff knew that the defendant had placed those individuals. CT Page 212
Despite the testimony of the defendant, Hoover and Polizzi to the contrary, the court finds proximate cause between the defendant's placement of these people and his misappropriation of the plaintiff's candidate files. "Courts necessarily rely upon circumstantial evidence and are entitled to draw reasonable and logical inferences from all the facts." (Internal quotation marks omitted.) Monroe v. Crandall, 3 Conn. App. 214, 220, 486 A.2d 657
(1985). "There is no legal distinction between direct and circumstantial evidence as far as probative force is concerned." (Internal quotation marks omitted.) Berchtold v. Maggi,191 Conn. 266, 273, 464 A.2d 1 (1983). While the evidence here is neither certain nor clear and convincing, that was not the plaintiff's burden of proof. The plaintiff was bound to prove its case by a fair preponderance of the evidence. Gach v. Franolich,10 Conn. App. 677, 682, 525 A.2d 525 (1987). The court finds that it did so with respect to these people.
The court also finds proximate cause between the placement of Jennifer Backs by the defendant, and his misappropriation of her résumé. The court does not credit Hoover's testimony to the contrary.
There is an issue as to whether "Judy Ruberi" is really the person named "Judith Rubin." A file folder marked "Judy Ruberi" was taken by the defendant and a copy of the cover was returned by him to the plaintiff. A question exists as to whether "Judy Ruberi" is really, by typographical error, marriage, or otherwise, "Judith Rubin." The copy of the file folder cover returned by the defendant reflects that "Judy Ruberi" was employed at Nabisco and ACN (A.C. Nielsen). Judith Rubin has this same employment history. The handwriting on the file folder is Dunsmore's. He indicated that he incorrectly wrote her name on the folder. The plaintiff surely could have adduced betterevidence as to this issue. Based solely on this evidence, and not mere conjecture, this issue is a close call. The court finds, however, that "Judy Ruberi" is really the person named Judith Rubin. Furthermore, the court finds proximate cause between the placement of Judith Rubin, and the defendant's misappropriation of the plaintiff's files.
The court does not find, however, proximate cause between the placement of Eric Taylor, Rob Nardone, Brian Powell, and Nandu Pasupuleti by the defendant, and his misappropriation of documents from the plaintiff. All of these people have two things CT Page 213 in common: (1) the defendant did not return their files or résumés to court in March, 1998, and (2) their names are not on the plaintiff's "missing file list."
The court also does not find proximate cause between the defendant's misappropriation of the plaintiff's documents, and his placement of Pat Custis. The defendant knew Pat Custis since the early 1980's. He placed her in positions twice before. She appeared in court and testified on his behalf. Whatever the shortcomings of the defendant's memory, he remembered Pat Custis, and recalled personal information relevant to placing her and where to find her. She would have readily provided him with her résumé.
From his placement of Fiery, Kohlstruck, Krish, Norgren, Whisler, Wingate, Backs, and Rubin, the defendant earned fees of $164,835.00. This is the measure of his unjust enrichment.[10]
 II
The plaintiff seeks punitive damages under CUTSA, General Statutes § 35-53(b). General Statutes § 35-53(b) provides: "In any action brought pursuant to subsection (a) of this section, if the court finds wilful and malicious misappropriation, the court may award punitive damages in an amount not exceeding twice any award made under subsection (a) and may award reasonable attorney's fees to the prevailing party."
Although the defendant's action was wilful enough, it was not malicious. Malice imports a motivating intent or design, actual or constructive, to harm. Triangle Sheet Metal Works, Inc. v.Silver, 154 Conn. 116, 128, 222 A.2d 220 (1966) (award of punitive damages reversed in action for divulging trade secrets in violation of contract); see Mingachos v. CBS, Inc.,196 Conn. 91, 102-03, 491 A.2d 368 (1985); Markey v. Santangelo,195 Conn. 76, 77-78, 485 A.2d 1305 (1985). While the evidence supports a finding that the defendant certainly was motivated to help himself, there is no evidence from which the court may reasonably infer that the defendant intended to harm the plaintiff. SeeTriangle Sheet Metal Works, Inc. v. Silver, supra, 154 Conn. 128; see also Roton Barrier, Inc. v. Stanley Works, 79 F.3d 1112, 1121
(Fed. Cir. 1996), rehearing denied, on appeal after remand,108 F.3d 1394 (Fed. Cir. 1997). For this reason, the plaintiff's claim for punitive damages under General Statutes § 35-53(b) is denied. CT Page 214
 III
The plaintiff alleges violation of CUTPA, General Statutes §42-110a et seq. and seeks punitive damages as authorized by General Statutes § 42-110g(a). General Statutes § 42-110g(a) provides, in relevant part, that for "[a]ny person who suffers any ascertainable loss" as a result of violation of General Statutes § 42-110b, "[t]he court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper." Such damages may be awarded in the discretion of the court "even if [the court] finds that the plaintiff has not suffered ascertainable damages." Jacques AllTrades Corp. v. Brown, 42 Conn. App. 124, 131, 679 A.2d 27, cert. granted in part, 239 Conn. 914, 682 A.2d 1001 (1996), cert. granted in part, 240 Conn. 903, 688 A.2d 332 (1997), aff'd,240 Conn. 654, 692 A.2d 809 (1997).
General Statutes § 42-110b(a) provides "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." When determining whether a practice is unfair, the court looks at the following criteria: "(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [(competitors or other businessmen)]." (Internal quotation marks omitted.) McLaughlinFord, Inc. v. Ford Motor Co., 192 Conn. 558, 568, 473 A.2d 1185
(1984). The defendant's taking of the plaintiff's documents, containing its trade secrets, without permission, and using them in his business for competitive advantage satisfies the first two criteria. In addition to being an unfair practice, it constitutes unfair competition. See Town Country House Homes Service,Inc. v. Evans, supra, 150 Conn. 319; Allen Mfg. Co. v. Loika,
supra, 145 Conn. 514; May v. Young, 125 Conn. 1, 7, 2 A.2d 385
(1938).
"The standard for awarding punitive damages under CUTPA was established in Gargano v. Heyman, [203 Conn. 616, 622,525 A.2d 1343 (1987)], where our Supreme Court held that punitive damages are available when there is evidence of a reckless indifference CT Page 215 to the rights of others or an intentional and wanton violation of those rights. . . . In fact, the flavor of the basic requirement to justify an award of punitive damages is described in terms of wanton and malicious injury, evil motive and violence. . . ." (Internal quotation marks omitted.) Staehle v. Michael's Garage,Inc., 35 Conn. App. 455, 462-63, 646 A.2d 888 (1994). Here, while it may be said that the defendant acted in reckless indifference to the plaintiff's rights, the evidence lacks the pungent "flavor" that usually accompanies an award of punitive damages. See Devitt v. Manulik, 176 Conn. 657, 659, 663 n. 3, 410 A.2d 465
(1979). The plaintiff's claim for punitive damages under CUTPA, General Statutes § 42-110g(a) is denied.[11]
 IV
In the third count of the complaint, the plaintiff alleges that the defendant is liable for tortious interference with business relationships. "A claim for tortious interference with contractual relations requires the plaintiff to establish (1) the existence of a contractual or beneficial relationship, (2) the defendant['s] knowledge of that relationship, (3) the defendant['s] intent to interfere with the relationship, (4) the interference was tortious, and (5) a loss suffered by the plaintiff that was caused by defendant['s] tortious conduct.Robert S. Weiss Associates, Inc. v. Wiederlight, [supra,208 Conn. 535-36]; Hart, Nininger Campbell Associates, Inc. v.Rogers, 16 Conn. App. 619, 629, 548 A.2d 758 (1988)." Collum v.Chapin, 40 Conn. App. 449, 452, 671 A.2d 1329 (1996). The plaintiff has not established any of these elements.
 V
The defendant has asserted a counterclaim in two counts. The first count, breach of contract, claims that the plaintiff failed to pay the defendant a commission owed to him. The second count, breach of the implied covenant of good faith and fair dealing, was expressly abandoned at trial.
In or about 1983, the plaintiff and the defendant agreed that in exchange for the defendant's continued performance of services, the plaintiff would pay the defendant commissions that consisted of 21% of the plaintiff's gross billings, including those for which the defendant was responsible. This was the agreement, with respect to commissions for placements, throughout the remaining term of the defendant's employment with the CT Page 216 plaintiff. In November, 1997, the defendant placed a candidate at Kraft Foods. On November 17, 1997, the plaintiff billed Kraft Foods $18,900.00 for that placement. On January 22, 1998, Dunsmore fired the defendant based on his belief that the defendant had been misappropriating the plaintiff's documents. Subsequently, the plaintiff received the $18,900.00 fee from Kraft Foods. The plaintiff has refused to pay the defendant his percentage of this fee.
"It has long been the law of this state `that in contracts of hiring there is an implied condition that the servant will perform the duties incident to his employment honestly, and will do nothing injurious to his employer's interest, and if he proves radically unfaithful to his trust or is guilty of gross misconduct he forfeits all right to compensation.' Phoenix MutualLife Ins. Co. v. Holloway, 51 Conn. 310, 314 [1883]." Breen v.Larson College, 137 Conn. 152, 157, 75 A.2d 39 (1950). The compensation thus forfeited, however, is future compensation. Connecticut courts have never held that past compensation, already payable, is also forfeited. See also Berger v. BalmarMarine of Canton, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 441360 (February 28, 1992). "Ordinarily an employee does not forfeit his right to commissions, already earned, by the termination of his employment." 30 C.J.S., Employer-Employee, § 142 (1992); see Okenv. National Chain Co., 424 A.2d 234 (R.I. 1981); cf. Diana v.Burnside Motors, Inc., 30 Conn. Sup. 561, 304 A.2d 222
(1973).[12] Moreover, in Connecticut, there is a strong public policy in favor of payment of earned compensation. See General Statutes § 31-72. The court finds that the defendant is entitled to his percentage of the fee he earned for the November, 1997, Kraft Foods' placement at issue.
The plaintiff filed two special defenses claiming that the cause of action alleged, in whole or part, by the defendant in his counterclaim is barred by the applicable statute of limitations and the statute of frauds. These defenses, which do not appear to have merit, have not been briefed, and are deemed abandoned. Zeigler v. Town of Thomaston, 43 Conn. Sup. 373, 378,654 A.2d 392 (1994), aff'd, 232 Conn. 270, 654 A.2d 352 (1995);Grace Community Church v. Planning Zoning Commission,42 Conn. Sup. 256, 259, 615 A.2d 1092 (1992), aff'd, 30 Con. App. 765,622 A.2d 591, cert. denied, 226 Conn. 903, 625 A.2d 1375, cert. denied, 510 U.S. 944, 114 S.Ct. 383, 126 L.Ed.2d 332 (1993). CT Page 217
Judgment may enter in favor of the plaintiff on the first, second, and fourth counts of its complaint in the amount of $164,835.00. Judgment may enter for the defendant on the third and fifth counts of the plaintiff's complaint. Judgment may enter in favor of the defendant on the first count of his counterclaim, breach of contract, in the amount of $3,969.00.
BY THE COURT
Bruce L. LevinJudge of the Superior Court