[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
CT Page 9447
This application for a temporary injunction is brought by the plaintiffs, Classic Limousine Airport Service, Inc. (Classic) and Carey Limousine Stamford (Carey) against Alliance Limousine and Alan Oyugi (Oyugi) claiming, inter alia, violations by the defendants of the Connecticut Uniform Trade Secrets Act (CUTSA), the Connecticut Unfair Trade Practices Act (CUTPA) and breach of fiduciary duty.[1] The plalntiffs claim that Oyugi, a former employee of Classic, has violated CUTSA by misappropriating trade secrets in the form of customer lists, "profiles" and other confidential information belonging to the plaintiffs, and utilizing them in the formation of his own new limousine company, Alliance Limousine, in competition with and to the economic detriment of the plaintiffs. The plaintiffs also allege that Oyugi, in spreading falsities about Classic to the plaintiffs' customers, drivers, and employees, and in using Classic's livery permit and/or plates and insurance policies without its consent has engaged in unfair trade practices in violation of CUTPA. The plaintiffs seek a temporary injunction prohibiting, specifically, the defendants from using any of the plaintiffs' trade secrets or confidential information and ordering the defendants to return to the plaintiffs all such information stored or recorded in any medium; from contacting, soliciting, or doing business with any of the plaintiffs' customers with whom the plaintiffs have developed a customer "profile"; from using plaintiffs' trade secrets to target, solicit or contact driver-owners/operators doing business with the plaintiffs for hire by the defendants; from making false representations to plaintiffs' employees or driver-owners/operators doing business with the plaintiffs; and from using plaintiffs' livery permits and/or plates or insurance policies in the operation of defendants' business.
After five days of hearings, the court finds the following facts. Classic is in the business of providing limousine services primarily to corporate clients in Fairfield County. The business was formed by two brothers, Ronald and Leonard Ventura in 1984, who developed their business by advertisement, cold calling, and from public information, directories and lists of companies. CT Page 9448
Classic hired Oyugi in 1985, initially as a driver, but eventually he became general manager of the company. He was responsible for relations with all of the customers of Classic, and knew them well. He was familiar with the person or persons in each company responsible for arranging limousine services, and in many cases established friendly and social relationships with these "contact" persons. His development of strong relationships with customers was a great benefit to Classic and he was deemed to be a good and loyal employee. Oyugi also had duties regarding the supervision of staff and drivers and established close relationships with many of them as well. His managerial position did not provide him with any stock interest in the business nor was he an officer or director of the corporation. He did not have access to the corporation's financial and banking information, nor to its profit and loss statements, and he possessed no check-signing privileges.
In June, 1999, Classic was sold to Carey after many months of negotiations. Near the conclusion of the deal, Oyugi was told of the impending sale, and he became a focus of the transaction as the Venturas attempted to have him sign an employment agreement which Carey offered. Oyugi retained counsel to represent his interest. The various demands, offers and refusals made by the parties are important to this lawsuit only insofar as they resulted in no final agreement between Carey and Oyugi, created bad feelings, and may well have created additional impetus for this lawsuit.
Oyugi's employment with Classic ended no later than June 3, 1999 and he later decided to form his own limousine company, which he did in September, 1999. The plaintiffs claim that in so doing, the defendants used trade secrets and confidential information in violation of CUTSA and seek the intervention of this court to redress the alleged wrongs committed against them. The trade secrets claimed by the plaintiffs consist of customer or client lists, the contact names and telephone numbers, customer profiles containing customer preferences, and billing history. All of this information is contained in Classic's computer software known as Limoware, an off-the-shelf program used by many limousine companies. The plaintiffs claim the defendants used the information to obtain customers for their new business and to solicit drivers and employees to leave the plaintiffs and join the defendants.
In addition, according to the plaintiffs, Oyugi lied to customers and drivers concerning the circumstances of his termination from Classic, allegedly telling them that he was fired, was "left out in the cold" in the sale of the company to Carey, depicting the plaintiffs as bad people and thus injuring their relations with their customers, drivers and employees. This conduct is portrayed by the plaintiffs as a violation of CT Page 9449 CUTPA requiring a response by the court.
The plaintiffs ask the court for the extraordinary remedy; Scoville v. Ronalter, 162 Conn. 67, 74, 291 A.2d 222 (1971); of a temporary injunction and therefore undertake the burden of proving the probability of success after a full hearing on the merits, irreparable harm if the injunction is not granted, and a lack of an adequate remedy at law. Waterbury Teachers Assn. v. Freedom of Information Commission,230 Conn. 441, 446, 645 A.2d 978 (1994). Because the plaintiffs have not proven the probability of their success at a final hearing their application for a temporary injunction must be denied.
Plaintiffs' Claim Under the Connecticut Uniform Trade Secrets Act (CUTSA)
After Oyugi's termination from the service of his former employer Classic, he had an obligation not to use trade secrets learned in the course of his employment for his own benefit to the detriment of his former employer. Allen Mfg. Co. v. Loika, 145 Conn. 509, 514, 144 A.2d 306
(1958). However, simply competing with his former principal after termination of the agency does not give rise to a cause of action; Town 
Country House Homes Service v. Evans, 150 Conn. 314, 317, 189 A.2d 390
(1963); where, as here, no restrictive covenant prevents it. The issue, therefore, is whether Classic's customer lists and profiles were trade secrets which Oyugi misappropriated for use in the formation of his new company.
"Trade Secret" is defined by statute (General Statutes, Section 35-51
(d)) as "information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure and use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."
"Misappropriation" means: "(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret of another without express or implied consent by a person who (A) used improper means to acquire knowledge of the trade secret; or (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was (i) derived from or through a person who had utilized improper means to acquire it; (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use . . . ; or (iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (C) before a CT Page 9450 material change of his position, knew, or had reason to know that it was a trade secret and that knowledge of it has been acquired by accident or mistake." General Statutes, Section 35-51 (b).
It is true that a customer list may be a trade secret. "If in any particular business the list of customers is, because of some peculiarity of the business, in reality a trade secret and an employee has gained knowledge thereof as a matter of confidence, he will be restrained from using that knowledge against his employer. On the other hand, where the identity of the customers is readily ascertainable through ordinary business channels or through classified business or trade directories, the courts refuse to accord to the list the protection of a trade secret." Town Country House Homes Service v. Evans, supra,150 Conn. 320. The customer list here consisted of the names of the corporate clients, the contact names and telephone numbers, billing history and customer profiles containing customer preferences. This information was stored "on Classic's computer software, Limoware. It was obtained by the plaintiff through advertisement, public information and directories, cold calling and from lists of companies. The contact names and profiles and preferences were obtained from the companies themselves, by having them return information sheets which were then input into the computer. Oyugi formed his business in the same manner, except that he already knew the names of many of the companies and contacts from his experience with Classic. He contacted no customers prior to his severance from Classic, nor there is evidence that he brought with him when he left any written materials or copies thereof, nor that he ever accessed the plaintiffs' computers after he left Classic's employ. From his constant, close and sometimes personal relationships with his former clients, he retained in his memory the names of many companies and people. See Tricoastal Lanthanides. Inc. v. Chang, Superior Court, judicial district of Stamford/Norwalk at Stamford, Docket No. CV95 0144760 (September 11, 1995, D'Andrea, J). But what clearly defeats the plaintiffs' claims is that the information sought to be protected is not entitled to "trade secrets" status. To be a trade secret, a customer list must derive "independent, economic value . . . from not being generally known to, and not being readily ascertainable by proper means by other persons. . . ." (Emphasis added) Connecticut General Statutes § 35-51
(d). Besides the names of the companies, the profiles would contain the home address and phone numbers of the passengers, sometimes whether he or she had a driver preference, directions to his or her house, and sometimes whether a stretch limo or a town car was preferred.
Competition in the limousine service business is substantial. There are literally hundreds of companies in Fairfield County whose employees require transportation to New York airports, and there is nothing unique about the business. Companies are readily identified by reference to CT Page 9451 directories, phone books, the Internet and by pounding the pavement. No companies have exclusive contracts with any one limousine service company, but often avail themselves of the service of several. In fact, some of the defendants' customers still retain Classic on the list of limousine services to be used.
The plaintiffs concede that what separates one limousine company from another is customer service. The court senses nothing extraordinary about sending a driver in a car to pick up a passenger and taking that person to the airport. As stated above, potential customer companies are generally known or are readily ascertainable; no independent economic value is derived from knowing the names of plaintiffs' customers; with little more difficulty, one can determine with a phone call who in any particular corporation is in charge of arranging transportation for its employees, and customer preferences can be obtained by asking one or two further questions. These are not trade secrets, because the information is readily ascertainable by proper means. Connecticut General Statutes § 35-51 (d)(l); Ivy Mar Co., Inc. v. C. R. Seasons Ltd.90 F. Sup. 547, 557-58 (E.D.N.Y. 1995).
With respect to billing history, this information likewise is readily ascertainable. A call to a customer will yield the credit card that will be used and the extent of use of limousine services. But beyond that, the plaintiff Classic made little effort to maintain secrecy concerning this or any other information on Limoware. Classic's employees were given access to all of this customer information, with little effort to maintain its confidentiality. No employees were advised of the confidentiality of any of this information, there were no written policies or agreements concerning the same, and no employees were ever warned upon hiring or leaving that such information was secret or confidential. These facts in and of themselves disqualify the information from trade secrets status. A trade secret must be the "subject of efforts that are reasonable under the circumstances to maintain its secrecy." Connecticut General Statutes § 35-51 (d)(2). "The question of whether, in a specific case, a party has made reasonable efforts to maintain the secrecy of a purported trade secret is by nature a highly fact-specific inquiry." (Citation omitted). Elm City Cheese Co. v.Frederico, 251 Conn. 59, 80, ___ A.2d ___ (1999). The court finds that, under the circumstances, there were no reasonable efforts made to maintain secrecy. The court observes that this may well be because reasonable people, including the owners of Classic, would not have viewed the names of their customers (companies generally known in the area) and information about them (readily ascertainable with a modicum of effort or ingenuity) to constitute trade secrets in the first place.
The court concludes that the defendants have not violated the CT Page 9452 Connecticut Uniform Trade Secrets Act. Rather, Mr. Oyugi, having learned the limousine business in the employ of Classic, decided for reasons having no bearing on the merits of this case, to leave their employ and not to join Carey, and eventually to start his own company. He did so without breaching any duty owed to his former employer, and with no restrictive covenant prohibiting it. Rather, using contacts retained in his memory, information generally known or readily ascertainable, and knowledge of how to operate such a business, learned through experience, he embarked on his own endeavor in competition with many other enterprises, including the plaintiffs', vying for the business of a finite number of identifiable customers. Because he did not begin to compete with his employer in any way prior to the termination of his employment, and because the employer's customer list is not a trade secret, Mr. Oyugi's actions are validated by the principles announced inTown Country House Homes v. Evans, 150 Conn. 314, 189 A.2d 390
(1963).
 Plaintiffs' Claims Under the Connecticut Unfair Trade Practices Act (CUTPA)
The plaintiffs claim that the defendants violated the Connecticut Unfair Trade Practices Act (CUTPA) because Oyugi misappropriated trade secrets of the plaintiff, the defendants operated their business without proper permits and insurance, and Oyugi spread falsehoods to Classic's clients, drivers and employees about the circumstances of his termination.
Because the court has found that the defendants did not misappropriate any trade secrets of the plaintiff, plaintiffs' claim of CUTPA violation on that ground fails.
With respect to the defendants' alleged failure to have proper livery permits and insurance, the court finds that the defendant Alliance Limousine, as a start-up company, initially used the interstate permits of David DeBaise Transportation. If there were technical errors in the defendants' initial use of permits, these did not rise to the level of CUTPA violations entithng the plaintiffs to the discretionary injunctive relief sought. See Connecticut General Statutes § 42-110g(d). Furthermore, that the defendants' drivers used Classic insurance or plates is an allegation not proven to the court.
The plaintiffs claim that Oyugi lied to Classic's customers, drivers and employees about the nature of his termination from the company. There was much testimony concerning the happenings of June 3, 1999, the last day of Oyugi's employment and the day of the closing of the sale of Classic's business to Carey. The ultimate question at the time was CT Page 9453 whether Oyugi would sign an employment agreement with Carey which contained a two-year restrictive covenant. Carey made it a requirement of his employment, and Oyugi refused to sign it, left the negotiating table and never returned.
The plaintiffs viewed these actions of Oyugi as constituting his unilateral decision to quit his job. Oyugi feels that Carey's insistence on his signing the employment agreement with a restrictive covenant, which he had never had prior to this time, meant termination if he refused to sign. The court finds neither interpretation unreasonable, but for the same reason, cannot find that Oyugi was guilty of any misrepresentation or intent to injure the plaintiffs if he told customers, drivers and other employees of Classic that he was fired because he refused to sign the agreement. The court finds no evidence that any conduct of the defendant Oyugi after his termination, be it voluntary or otherwise, amounts to a violation of C.G.S. § 42-110b or the criteria that has been applied to its interpretation, known as the "Cigarette Rule", repeatedly pronounced in appellate and superior court decisions over the years and needing no repetition here.[2]
Finally, the plaintiffs' claim of a breach of fiduciary duty by Oyugi must fail. There is no evidence whatsoever that he either began a new business, or approached or solicited clients, drivers or employees of Classic while he was still employed there. After his employment ended, his fiduciary duty not to compete with Classic also ended. Town CountryHouse Homes v. Evans, 150 Conn. 314, 189 A.2d 390 (1963).
To prevail after a hearing on a temporary injunction, a plaintiff must establish (1) that he will suffer irreparable harm if an injunction is not granted, (2) that there is a reasonable likelihood of success on the merits after a full hearing, and (3) that there is no adequate remedy at law. The court will also balance the equities between the parties to determine whether the denial of relief will result in greater harm to the plaintiff than will result to the defendant from the granting of relief. See Griffin Hospital v. Commission on Hospitals and Health Care,196 Conn. 451, 493 A.2d 229 (1985).
The court finds, based upon an evaluation of the testimony presented, the witnesses and the exhibits, that the plaintiffs have not established a reasonable likelihood of success on the merits of their case, and in the exercise of its discretion, the court denies the application for temporary injunction.
So Ordered.
D'ANDREA, J CT Page 9454