[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON THE PLAINTIFF'S APPLICATION FOR A TEMPORARY INJUNCTION
 I STATEMENT OF THE CASE AND FINDINGS OF FACT
Pending before the court is the plaintiff's application for a temporary injunction in which the plaintiff claims that it is entitled to injunctive relief to prevent irreparable harm caused by the defendants' conduct. The plaintiff has filed a fourteen-count complaint, but in support of this application, the plaintiff relies solely on those counts that allege that the defendants have violated the Connecticut Uniform Trade Secret Act, General Statutes §§ 35-51, et seq., the Lanham Act,15 U.S.C. § 1125 (a) et seq., and the employment agreements signed by the defendants. The court has bifurcated its consideration of the application so that the court will first determine whether the plaintiff is entitled to relief, and if so, the court will hold further proceedings regarding the manner and scope of any preliminary relief. Evidentiary proceedings having been held on the application, the court makes the following factual findings.
The plaintiff, NewInno, Inc. is a Connecticut corporation, formally doing business as Innotech Corporation. Curt Eastman is the sole shareholder and principal of NewInno, Inc. Among other roles, he works as a sales person and an identifier of new business. His wife, Joan Lathrop, works for the company as the Vice-President of Operations. Innotech Corporation's business is to help established companies identify and develop existing or new products, and to identify solutions to technical or product problems.
The plaintiff provides these services through a process that it calls "Planned Growth." Planned Growth essentially involves a detailed process by which the plaintiff becomes familiar with the client's needs and then identifies experts who have the expertise to provide assistance or CT Page 15210 solutions to the client's problem. The process is done as part of a structured plan or format designed specifically for the client. As discussed further below, the plaintiff maintains a "BrainBank" where it keeps profiles and information about experts that may be used in the "Expert Sessions." The plaintiff also has "Sales Files" where it maintains client information and leads.
The individual defendants are all former employees or agents of the plaintiff. The defendant John Peregrim was employed as the vice president of sales and was primarily responsible for the development of new business. The defendant Russell Koch worked as a business development manager pursuant to an employment contract. In this capacity, Koch developed new business leads, staffed client projects and expert sessions, and updated sale files. The defendant Barbara Hemlich was employed as a Program Manager. She was responsible for identifying experts and working with clients. The defendant Renee Gill was employed as an administrative assistant responsible for secretarial activities, database administration and design, and coordination of expert sessions.
The plaintiff claims that all of these defendants in varying degrees had access to the BrainBank and Sales Database. The BrainBank is a computer data bank containing names and biographical information of experts. The BrainBank was developed by the plaintiff, through its employees, over many years and with deliberate effort and expense. In addition to general contact and biographical information, the BrainBank also contained contact history about the expert which included the names of clients for whom the expert had been used, the nature of the expert's participation, and written evaluations of the expert's performance. There was conflicting evidence about how often the BrainBank was used or updated, but the evidence established that the BrainBank was a key marketing tool of the plaintiffs business and was often used by the plaintiff, along with other sources, to identify experts needed for business projects.
The Sales Database contained information about actual and prospective clients. There are two aspects of the Sales Database that are most pertinent to this litigation. First, the Sales Database contains information identifying key individuals within companies who are responsible for projects that may be amenable to the services provided by the plaintiffs business. In addition to this more general information, the database also identified "hot prospects," or clients whom the plaintiffs staff had communicated with about specific possible projects.
During 2001, dissatisfaction arose in the company emanating, to some degree, from a decrease in the plaintiffs business and earnings. In CT Page 15211 August 2001, defendant Heimlich and another employee were terminated. These terminations were followed by the resignations of Gill and Peregrim in October 2001, and of Koch in November 2001.
In or about September 2001, before resigning his position with the plaintiff, Peregrim prepared a business plan for the defendant corporation, Peregrim Development, Inc. (doing business as Paragon Development). This company was formally incorporated in Connecticut in October 2001. Paragon Development was not only structured and positioned as a competitor of Innotech, it was designed as a virtual carbon copy of the plaintiff company. This is evidenced in various ways by Paragon's organization and marketing materials, but may be best exemplified by its website.
Soon after its incorporation, Paragon created a website. This website published testimonials as if these testimonials were from Paragon clients expressing their satisfaction with Paragon's work. In actuality, all these testimonials were from Innotech clients expressing satisfaction with Innotech's services, or in some specific instances, acknowledging the work that defendant Peregrim had done while an employee of Innotech. On the website, the description of Paragon's services mirror the description of Innotech's services, except that the website makes substitutions such as "Paragon Network" for "BrainBank," "Process" for "Planned Growth," and "Network Forums" for "Expert Sessions."
Paragon also advertised on its website that its "Paragon Network" consists of over 4,000 key leaders who represent knowledge domains that our clients need to access." During the short existence of Paragon, it is inexplicable how this list grew so large, so fast unless it is derived from experts the individual defendants became aware of during their employment with Innotech. The plaintiffs offered indirect evidence that defendant Gill copied the BrainBank, but evaluating the evidence as a whole, the court concludes that the plaintiff has failed to meet is burden of proof to establish this claim.
The website also published a "partial list of organizations that the Paragon Development professional staff have worked with." On its face, this statement may be true in that the people working at Paragon have worked with these organizations, but the statement conveys a false impression that these organizations have been clients of Paragon when they actually were Innotech clients whom the individual defendants serviced when they were Innotech employees.
Particularly through the specific actions of defendants Peregrim and Koch, Paragon, from its inception, proceeded on a course to take away CT Page 15212 projects being worked on or pursued by the plaintiff for various, potential clients. These clients included Nestle, Air Products, ISP, UOP, BP and Owens-Corning. In some instances; these individual defendants began to engage in these efforts for Paragon's benefit before terminating their employ with the plaintiff.
For example, while still an Innotech employee, Peregrim met with a John Babiec, a consultant working for Innotech, and explained to Babiec that his new company Paragon could service certain prospective clients that Babiec was pursuing for Innotech. There is no evidence that these conversations resulted in any proposals being submitted to these prospects by Paragon, but that was not the case in other instances. As a further example, while still under contract with the plaintiff, Koch e-mailed to Peregrim, Innotech's written proposal for a project with Nestle. At the time of the e-mail, Peregrim had resigned from his position at Innotech and was working to establish and find work for Paragon. The information provided to Peregrim about Nestle included Innotech's client contact, quoting process and pricing information. Paragon later submitted a competing proposal to Nestle. Paragon also submitted proposals to the companies ISP, UOP, BP and Air Products. To date, none of these proposals have resulted in any business for Paragon. Paragon became aware of all these potential projects because they were Innotech prospects.
None of the defendants, except for defendant Heimlich, signed non-competition agreements with Innotech precluding them from competing with the plaintiff once they left the plaintiffs em ploy. On the other hand, all the defendants executed confidentiality agreements for the benefit of the plaintiff.[1]
Barbara Heimlich signed a "Non-Competition Agreement," but this document explicitly has her initials and the word "No" next to two paragraphs indicating that she was not agreeing to the provisions contained in those paragraphs. Based on the evidence, the court finds that there was no "meeting of the minds" as to these two paragraphs one of which includes the non-competition provision.
 II DISCUSSION A STANDARD OF REVIEW CT Page 15213
Well settled Connecticut law is that a plaintiff is entitled to a preliminary or temporary injunction if the plaintiff proves a reasonable likelihood of success on the merits, irreparable harm to the plaintiff and lack of an adequate remedy at law. Branch v. Occhionero, 239 Conn. 199,207, 681 A.2d 306 (1996); Griffin Hospital v. Commission on Hospitals Health Care, 196 Conn. 451, 457-58, 493 A.2d 229 (1985).
"The issuance of an injunction and the scope and quantum of injunctive relief rests in the sound discretion of the trier." Krulikowski v.Polycast Corp., 153 Conn. 661, 669, 220 A.2d 444 (1966). "Injunctive relief may not lie where it is predicated on the fears and apprehensions of the party applying for it or where it would be incompatible with the equities of the case . . . and likewise the power of equity to grant such relief may be exercised only under demanding circumstances. . . . The extraordinary nature of injunctive relief requires that the harm complained of is occurring or will occur if the injunctive relief is not granted. Although an absolute certainty is not required, it must appear that there is a substantial probability that but for the issuance of the injunction, the party seeking it will suffer irreparable harm." Karls v.Alexandra Realty Corp., 179 Conn. 390, 402, 426 A.2d 784 (1980).
 B LANHAM ACT
The plaintiff claims that the defendant's committed acts that violate the Lanham Act, 15 U.S.C. § 1125 (a).[2] More specifically, in the Sixth Count the plaintiff alleges: "By advertising NewInno's clients as clients of Paragon; by publishing excerpts from letters directed to NewInno as testimonials of Paragon; by claiming a copyright with respect to property of NewInno; and by misrepresenting Paragon as a "spin-off' of NewInno, defendants have committed violation of the Lanham Act." In the following respects, the court agrees with the plaintiff and finds that the plaintiff has met its burden of proving that defendant Paragon Development violated the Lanham Act.
First, Paragon, through the actions of John Peregrim, used testimonials on its website that were from Innotech's clients in which these clients acknowledged their appreciation of the services provided by Innotech, not Paragon. (Exhibit 8) The corporate defendant's website literally copied testimonials changing key words so that, for example, "BrainBank" became "Network," "Innotech BrainBank" became "PARAGON Network," and "Expert Sessions" became "Network Forums." Paragon deliberately altered and used these testimonials to convey the false and misleading impression that the authors of the testimonials had used Paragon's services, and Paragon did CT Page 15214 so in a manner that would clearly cause confusion and deception. Contrary to the defendants' position, the fact that Paragon stopped using these testimonials as a result of the plaintiffs complaints and the institution of this lawsuit does not moot the issue or make injunctive relief unavailable. The law is well established that a defendant's unilateral and voluntary cessation of wrongful conduct does not automatically moot a plaintiffs claim for relief unless a defendant demonstrates that there is no reasonable expectation that the wrong will be repeated. See UnitedStates v. W.T. Grant Co., 345 U.S. 629, 632 (1953). The defendant here has not shown exactly what testimonials will be used in the place of the offending testimonials. The defendants have failed to demonstrate that the offensive conduct will not recur.
Additionally, on its initial website, Paragon identified "projects" that it has been involved with and a general description of the client or industry served. There is no dispute that the project descriptions on this list were substantially lifted in both form and content from the identical descriptions that Innotech maintained for clients serviced by Peregrim while he was an Innotech employee. (See Exhibits 22 and 23.) Again, the presentation made by Paragon in this website gives the false and misleading impression that these were Paragon projects, when in reality they were Innotech projects. The court rejects the defendants' position that a finding in favor of the plaintiff on this issue would preclude former employees of Innotech from describing what they did or referring to their experience, because this is not what the defendants merely did here. They have described their former experience in such a way that it conveys the false impression that the projects they worked on and the services that they provided at Innotech as part of the "Planned Growth" methodology were actually provided at Paragon as part of the "Paragon Process."
The defendants do not seriously defend the legitimacy of Paragon's projects advertisement as it appeared on the initial website. The defendants insist that the plaintiff cannot establish a need for injunctive relief because the present website has been modified to include disclaimers. The beginning of the projects section of the website now contains the following "disclaimer:"
 "PARAGON Development is not limited to any particular technology, industry or market as shown by the partial listings of Industries Served and Markets Targeted. We have compiled a few examples of projects that we have been involved with in the past as consultants or through previous employment. The outputs achieved are indicative of the value achieved through the CT Page 15215 combination of our experienced staff and access to information.
 Click on the highlighted selections below to read about some of our projects." (Exhibit M) (Emphasis added.)
After providing a descriptive list of "industries served" and the "outcomes" achieved, the section ends with the further qualification:
 "The project examples are those reflecting experience of the professional staff of PARAGON Development and no claim is made that these projects were contracted with PARAGON Development as an organization." (Exhibit M.)
In regard to these "disclaimers", the court is not satisfied that when read in full context, these "disclaimers" are sufficient to avoid confusion or deception under all the circumstances presented. There still exists the impression that some of these projects may have been Paragon projects when in fact none of them were. This impression is particularly poignant when the projects are referred to as "our projects." Furthermore, although the website explains that the "outputs achieved" are indicative of the individual defendants' "access to information," their access to this information was not truly based entirely on their own knowledge or efforts, and certainly was not based on Paragon's resources. The success of these projects to some significant degree is indicative of defendants' "access to information" from Innotech's sources. Additionally, the court reiterates that Paragon's voluntary and unilateral changes to the website do not necessitate a finding that the dispute is moot, although these disclaimers and the substance of the present website may affect the nature or extent of the relief-available to the plaintiff.[3]
In sum, the court rules that the plaintiff has met its burden of proof on its claim that Paragon violated the Lanham Act, and that the deception and confusion resulting from the defendants actions supports a finding of irreparable harm. See Black Hills Jewelry Mfg. v. Gold Rush, Inc.,633 F.2d 746, 753 (8th Cir. 1980) (a finding of a tendency to deceive is sufficient to satisfy the requisite of irreparable harm); BlaxoWarner-Lambert OTC, GP v. Johnson Johnson, 935 F. Sup. 327
(S.D.N.Y. 1996) (irreparable harm is presumed when advertisement is literally false.)
 C CT Page 15216 THE CONNECTICUT UNIFORM TRADE SECRET ACT
The Uniform Trade Secret Act, General Statutes § 35-51 ("UTSA") proscribes the misappropriation of trade secrets through improper means. The Uniform Trade Secrets Act, GENERAL STATUTES § 35-51 (d), defines a trade secret by the following nonexhaustive description: "information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."
"The factors used to determine whether given information is a trade secret include the extent to which the information is known outside the business and by employees and others involved in the business, the measures taken by the employer to guard the secrecy of the information, the information's value to the employer and to competitors, the resources the employer expends in developing the information, and the ease or difficulty with which the information could be properly acquired or duplicated by others." Robert S. Weiss Associates, Inc. v.Wiederlight, 208 Conn. 525, 538, 546 A.2d 216 (1988). "Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret." Town Country House Homes Service,Inc. v. Evans, 150 Conn. 314, 318, 189 A.2d 390 (1963).
In the absence of a restrictive covenant, a former employee may compete with his or her former employer upon termination of employment. Town Country House Home Service, Inc. v. Evans, supra,150 Conn. 317. Even after the employment has ceased, however, "the employee remains subject to a duty not to use trade secrets, or other confidential information, which he has acquired in the course of his employment, for his own benefit or that of a competitor to the detriment of his former employer." Allen Mfg. Co. v. Loika, 145 Conn. 509, 514,144 A.2d 306 (1958).
The plaintiff claims that the defendants misappropriated by improper means trade secrets contained in the plaintiffs Sales Database and its BrainBank.
 1 SALES DATABASE CT Page 15217
As to both the Sales Database and the BrainBank, the defendants argue that the plaintiff failed to take sufficient efforts to maintain the secrecy of this information in order for this information to come within the meaning of a trade secret as defined under UTSA. See General Statutes § 35-51 (d). The court rejects defendants' position and finds that the plaintiff took "efforts that are reasonable under the circumstances to maintain the secrecy of the information contained in these files." General Statutes § 35-51 (d). The information is stored in a password protected computer base and is not generally disseminated to the public or to customers. Access to the employer's business facilities is restricted and not generally available to the public; and although these defendants had varying access to this information as employees, the plaintiff took the reasonable effort to insist that they execute non-disclosure agreements acknowledging the privileged and confidential nature of this very information. Employees' access to a trade secret is not inconsistent with its secrecy, especially when the employees have been warned about its nature and use. The defendants' argument to the contrary is rejected. Additionally, the reasonable character of these efforts to maintain the confidentiality of this information in not diminished by the plaintiffs limited disclosure of this information for marketing or sales purposes as emphasized by the defendants. See Plastic MetalFabricators, Inc. v. Roy, 163 Conn. 257, 268, 303 A.2d 725 (1972) ("absolute secrecy is not essential and the plaintiff does not abandon his secret by delivering it or a copy to another for a restrictive purpose, nor by a limited publication"[internal quotation marks omitted]).
Specifically as to the Sales Database, although the parties have directed some attention to the customer list contained in this database, the plaintiff has conceded that the crux of its trade secret claim is not about a misappropriation of customer lists, but is about the defendants' misappropriation of sales leads developed by the plaintiff.[4] As previously described, Paragon essentially from its inception pursued a course of action to misappropriate potential business prospects from Innotech. The information about these business leads constituted trade secrets. The court expressly finds that this information provided specific and independent economic value and marketing advantage to the plaintiff explicitly because it was not generally known and could not be readily ascertained by competitors specifically or the public generally.
The defendants' argument that these potential projects could have been ascertained simply by calling the clients involved or meeting them at conferences misses the point. The economic and marketing advantage is created by knowing the specific individual at a specific company who is CT Page 15218 contemplating a specific project amenable to the services being offered by these competing businesses. This trade secret information not only included the client contact information, but also provided information about the nature and specifications of the project, the likelihood of the project being funded or pursued, and Innotech's responses to the clients' work requests. In the case of Nestle, Paragon submitted its proposal only after acquiring Innotech's quoting and pricing information. The court does not find credible the defendants' evidence that such sales lead and project proposal information may be readily ascertained through cold calls or public sources.
The fact that none of these proposals to date have been accepted by a client and some of them may be dead is irrelevant, especially since the evidence is clear that if the clients' interest revived Paragon would take the work if it could. The fact that these prospects may or may not have been "hot" prospects is also irrelevant because they were stillprospects. These were sales leads representing potential work that was either pursued or capable of being pursued by the plaintiff based on the particular information developed by it and not generally known to its competitors.
Thus, the court concludes that the plaintiff has met its burden of proof that the UTSA has been violated. As a result of the violation, irreparable harm is appropriately presumed and the plaintiff is entitled to injunctive relief. Because of the nature of trade secrets and the difficulty, if not impossibility, of proving actual damages, the right to injunctive relief is presumed upon a showing of misappropriation of trade secrets. Carpetmaster of Latham, Ltd. v. Dupont Flooring Systems, Inc.,12 F. Sup.2d 257, 263 (N.D.N.Y. 1998); see generally, Torrington Creamery,Inc. v. Davenport, 126 Conn. 515, 521, 12 A.2d 780 (1940).
 2 BRAINBANK
As previously discussed, the BrainBank is a computer data bank containing the names, identification and contact information of experts in various fields. The BrainBank is a key marketing tool of the plaintiffs business and is used along with other sources to identify experts needed for business projects. Paragon's equivalent to the "BrainBank" is its "Paragon Network."
As the court has found that the plaintiff has failed to prove that any of the defendants actually copied and took the BrainBank the question whether the defendants appropriated any trade secrets concerning it is a CT Page 15219 close question. For the following reasons, the court concludes that information which merely identifies an expert is not a trade secret. The evidence establishes that the names and addresses of these experts are ascertainable from public sources, such as the internet or classified or trade publications. These experts generally welcome and encourage the general availability of this identifying information. The individual defendants themselves located many of these experts, and consequently, the defendants know who they are and they are thoroughly knowledgeable about how these experts can be located and contacted through means entirely independent of the BrainBank. See generally, Robert S. Weiss Associates, Inc. v. Wiederlight, supra, 208 Conn. 538 (in evaluating whether items are trade secrets, a trial court may consider that the defendant developed the list at issue and has personal relationships with the individuals on it). Contrary to the plaintiffs position, the crucial factor is not whether the evidence here establishes that the defendants actually used these alternative sources to locate experts, but whether the information at issue was "readily ascertainable by proper means." General Statutes § 35-51 (d).[5]
 D BREACH OF CONTRACT
As described previously, all the individual defendants signed confidentiality agreements. The plaintiff claims that the defendants' actions violated these contracts by disclosing information covered by the agreements to Paragon for Paragon's use. Nondisclosure agreements may define proprietary or confidential information more broadly than UTSA or common law and may contractually preclude employees from disclosing such information at least to the extent that the agreements are consensual, reasonable and supported by consideration.
On the basis of the previous findings, the court concludes that the defendants Peregrim and Koch violated the terms of the confidentiality agreements executed by them because of their disclosure of information from the plaintiffs sales database; and Peregrim, Koch and Heimlich violated the confidentiality agreements because of their disclosure of information from the plaintiffs BrainBank.[6] Peregrim and Heimlich's agreements provided in part that they would never disseminate or disclose any information "relating to the names or other information included in the Company's Brain Bank" or "relating to the Company's lead/prospect and customer lists." Koch's nondisclosure agreement applied to Innotech's "inventions, designs, methods, processes . . . trade secrets and other private matters," and required him to keep such matters in trust solely for Innotech's benefit and precluded him from disclosing such information CT Page 15220 to any person.
These defendants have made two arguments contesting the enforceability of these agreements. They first argue that because they were asked to sign the agreements after their employment with NewInno had started, the agreements are unenforceable. The defendants rely on cases holding that continued employment is not adequate consideration for a covenant not to compete entered into after the beginning of the employment. See, e.g.,Artman v. Output Technologies, judicial district of Hartford at Hartford, Docket No. CV 00-0595362 S (June 28, 2000, Rittenband,J.T.R.). Assuming arguendo that this rule applies to confidentiality agreements, the court rejects the defendants' position for two reasons. First, the court finds that the defendants signed the agreements within a time frame sufficiently contemporaneous with the start of their employ for there to be adequate consideration for the agreement under the rule they advance.
In addition, however, the proposition that continued employment is insufficient consideration for a non-compete or confidentiality agreement is inapplicable to at-will employees such as these defendants. Except as otherwise prohibited by law, at-will employees may be terminated at an employer's discretion, and thus, continued employment, even after the start of the employment relationship, is sufficient consideration to support a confidentiality agreement. See generally, Weseley SoftwareDev. Corp. v. Burdette, 977 F. Sup. 137, 144 (D. Conn 1996).
The next argument by the defendants presents different difficulties. The defendants claim that the confidentiality agreements are so broad that they impose restraints on trade equivalent to non-compete agreements, and because of their breadth, they are unenforceable as a matter of public policy. Although the plaintiff received the opportunity to address this issue, it has not, and the court is reluctant to consider the question without fully hearing from the parties. Because the court must in any event hear from the parties regarding the appropriate remedy to be issued in light of the court's prior findings, the court will also reserve decision on the question whether the confidentiality agreements violate public policy and allow the parties to be heard further on this issue.
 III CONCLUSION
Therefore, as to the First Count of the complaint alleging violation of the Connecticut Uniform Trade Secrets Act and as to the Sixth Count of CT Page 15221 the complaint alleging violation of the Lanham Act, the court concludes that the plaintiff, NewInno, Inc., d/b/a Innotech, has met its burden of proof that it is entitled to injunctive relief and the case shall be scheduled for further proceedings regarding the appropriate remedy. As to the Second, Third, and Fifth Counts of the complaint alleging breach of contract against the defendants John Peregrim, Barbara Heimlich, and Russell Koch, the court reserves decision on these claims.
So ordered this 27th day of November 2002.
STEVENS, J.